**Rosanne B. SHORTER, Appellant–Respondent,**

v.

**Lester J. SHORTER, Appellee–Petitioner.**

No. 75A04–0508–CV–491.

Court of Appeals of Indiana.

July 28, 2006.

George R. Livarchik, Livarchik & Farahmand, Chesteron, IN, Attorney for Appellant.

Donald W. Pagos, Michigan City, IN, Attorney for Appellee.

## OPINION

FRIEDLANDER, Judge.

Rosanne B. Shorter and Lester Shorter were divorced via a summary dissolution decree, which incorporated a property settlement agreement (Settlement Agreement) reached by the parties. Thereafter, Lester filed a petition pertaining to the division of his pension[1] pursuant to the decree. Rosanne appeals the granting of Lester's petition, presenting the following restated issue for review: Did the trial court erroneously determine that Rosanne was not entitled to an increase in the pension fund that accrued after the valuation date, but before the QDRO creating her account became effective?

We reverse and remand with instructions.

The relevant facts are not in dispute. The Shorters divorced by summary dissolution decree, entered on March 10, 2003. In the decree, the court approved and incorporated the parties' Settlement Agreement. The only portion of the Settlement Agreement that would eventually come into dispute concerned Lester's pension. That provision of the Settlement Agreement stated:

That the wife is awarded one-half of the value in the husband's 401(k) and one-half of the value in the husband's pension plan as of this date and that the Court should enter a Qualified Domestic Relations Order (prepared by wife's attorney) to convey wife's interest in husband's pension and 401(k) plan. This Court retains jurisdiction to amend the Qualified Domestic Relations Order as may become necessary.

*Id.* at 9. Lester had signed the Settlement Agreement on February 24, 2003, and Rosanne signed it on March 7, 2003.

At approximately the time of the Shorters' divorce, Lester's employer, Bethlehem Steel, was going out of business. As a result, Pension Benefit Guaranty Corporation (PBGC) took over Bethlehem Steel's pension plan. Lester's pension was transferred to Fidelity Investments (Fidelity). During 2003, its value fluctuated due to market conditions. Between January 1 and March 31 of that year, it decreased in value by $3830.16, from $165,231.43 to $161,401.27. By June 30, 2003, the pension account had been transferred into a rollover IRA at Fidelity. By November 1, 2003, its value had increased to $188,713.77.

Because Bethlehem Steel was going out of business and the pension accounts were being transferred to different carriers, there was a delay in dividing Lester's 401(k) between the parties. On October 30, 2003, Lester sent the following letter to Fidelity:

Please accept this as my letter of instruction that you are to *roll over* from my Account ... into the account of my former wife, Rosanne Shorter, ... half of my Fidelity Account at the time the dissolution of marriage action was granted. This account total was in the amount of $161,401.27 and, therefore, please roll over into the account of my former wife one-half, or the sum of $80,700.64.

*Id.* at 4 (emphasis in original). On November 11, 2003, Rosanne's dissolution attorney sent the following letter to Fidelity:

---

1. "Pension" and "401(k)" are used interchangeably throughout the appellate materials. Unless otherwise indicated, we will use "pension" as a generic reference to both terms.

Pursuant to your instruction in letter dated October 20, 2003, I am enclosing:

Letter of acceptance from the recipient IRA owner/Rosanne B. Shorter indicating agreement to the transfer instructions.

Letter of instruction from relinquishing IRA owner/Lester J. Shorter that includes the account number . . . and the amount that needs to be transferred ($80,700.64).

*Id.* at 4–5. On November 24, 2003, Fidelity transferred $94,207.08 (not $80,700.64) into a new IRA in Rosanne's name.

On January 29, 2004, Rosanne's new attorney sent the following letter to Fidelity:

I am confirming that a problem has arisen as a result of transfers made by Fidelity Investments pursuant to the enclosed October 20, 2003 letter from Jen Bee of Fidelity and the enclosed November 11, 2003 letter from Rosanne Shorter's former attorney. . . .

Per the enclosed November 11, 2003 letter, the IRA owner, Lester J. Shorter, authorized the amount to be transferred to be the sum of $80,700.64. Also enclosed under that November 11, 2003 letter was certified copy of the Dissolution Decree that at page three, paragraph 11 awarded Wife one-half of Husband's 401(k) . . . "as of this date". Please note page one of the Final Property Settlement Agreement shows the date of the Agreement to be the 7th day of March, 2003. This is consistent with the date of the notary on the last page (March 7, 2003), although the document was not, in fact, filed with the Court until March 10, 2003.

It appears that the amount that Mr. Shorter thought he was authorizing was one-half of the March 7, 2003 balance in the account (i.e., $80,700.64). Per November 25, 2003 telephone conversation from Wayne and then Dave of Fidelity,

Rosanne learned that Fidelity had transferred the sum of $94,207.06 into her account. Please understand that Rosanne only seeks to have in her account, the amount that was awarded to her per the March 10, 2003 Divorce Decree/Final Settlement Agreement, consistent with Indiana law. Thus, the correct division should have been as follows:

1. Effective March 7, 2003, should divide Lester J. Shorter/Participant's account into two separate accounts:

a) The first account would be the account owned by Rosanne B. Shorter/Alternate payee (recipient) and would include one-half of the March 7, 2003 balance in Lester's account (taking a pro rata share from all investment options), together with any gain or loss thereon after March 7, 2003.

b) The second account would be the account owned by Lester J. Shorter/Participant and would consist of the rest and remainder of the March 7, 2003 balance in Lester's account, together with any gain or loss thereon after March 7, 2003.

It appears that Fidelity mistakenly divided Mr. Shorter's account on November 25, 2003 by simply dividing the November 25, 2003 balance in half. My client is requesting that Fidelity correct that error at this time. In order for that to be done, I need you to fax to me . . . your calculations showing the division of Lester J. Shorter's Fidelity account as of March 7, 2003, into the two separate accounts described above, your letter should then provide either statements of account or calculations showing how Wife's one-half interest in the March 7, 2003 balance in the account, had gains and/or losses from March 7,

2003 until the date Fidelity deposited $94,207.06 in her account.

*Id.* at 78–79. Fidelity responded on February 16, 2004 with charts indicating that if Rosanne's half of Lester's pension account been deposited into her own account on March 7, by November 24, 2003, that account would have accrued total gains of $12,512.41 and been worth $90,711.13. At that point, Rosanne notified Lester of her view that she was entitled to $90,711.13 from his pension account as of November 24, 2003, and that she would return the $3495.95 difference as overpayment. Lester rejected that position, claiming that she was entitled to only $80,700.64, i.e., one-half of the value of the account as of March 10, and not the interest earned thereon from March 7 until November 24 of 2003.

The parties reached an impasse, and on February 22, 2005, Lester filed a petition asking the court to clarify that Rosanne was entitled to $80,700.64, not $90,711.13. On July 26, 2005, the trial court granted Lester's petition, issuing the following order:

1) The Final Decree of Dissolution provides (in part) that the Property Settlement Agreement "is in complete discharge of the legal obligation of [sic] each of the parties owe to the other. . . ."

2) The final Property Settlement referred to above provided (Paragraph 11) "that Wife is awarded one-half of the value in the Husband's 401(k) and one-half of the value in the Husband's pension plan *as of this date* . . ." (Emphasis added).

3) The Final Property Settlement is dated 10 March 2003.

4) The account value of the 401(k) on 7 March 2003 is $78,192.72.

The Court concludes:

1) The provisions of the Final Decree and the Final Property Settlement are clear and unambiguous.

2) The law provides that parties to an investment plan will share the rewards and risks associated with the plan absent express language stating otherwise.

3) The parties expressly agreed in the Property Settlement that the Wife's interest was determined "as of this date" (10 Mar. 03). The expressed [sic] language of a determination is clear as to date and financial interest.

4) There is no necessity to interpret any ambiguity as there is none.

5) These parties voluntarily crafted their own settlement agreement which language is to be given its plain and ordinary meaning.

6) This Court recognizes and enforces the agreement of these parties according to the language of the instrument.

*Id.* at 27–28.

We begin our analysis by noting the parties disagree as to the appropriate standard of review. Lester contends that we should employ an abuse-of-discretion standard because the petition upon which this action is ultimately based, i.e., the February 25, 2005 petition to order the return of Fidelity's putative overpayment to Rosanne, should be treated as a motion for relief from judgment. Claiming that Rosanne has acquiesced in so designating the petition, Lester cites *Beike v. Beike,* 805 N.E.2d 1265 (Ind.Ct.App.2004) in support of his contention that the ruling on such a motion is reviewed for abuse of discretion. Rosanne, on the other hand, claims the matter should be reviewed de novo, as it involves construing the provisions of a written contract. We agree with Rosanne.

When dissolving a marriage, the parties are free to draft their own settle-

ment agreement. *White v. White,* 819 N.E.2d 68 (Ind.Ct.App.2004). Such agreements are contractual in nature and become binding upon the parties when the dissolution court merges and incorporates that agreement into the divorce decree. *Id.* When interpreting these agreements, we apply the general rules applicable to the construction of contracts. *Id.; see also Myers v. Myers,* 560 N.E.2d 39 (Ind. 1990) (holding that divorcing couples are free to divide their property in any way and their agreement is interpreted as any other contract). That is, unless the terms of the contract are ambiguous, they will be given their plain and ordinary meaning. *Id.* Clear and unambiguous terms in the contract are deemed conclusive, and when they are present we will not construe the contract or look to extrinsic evidence, but will merely apply the contractual provisions. *Id.* Terms are not ambiguous merely because the parties disagree as to the proper interpretation of those terms. *Id.* Our Supreme Court has determined that the dissolution court that enters a property settlement agreement is in the best position to resolve questions of interpretation and enforcement of that agreement and thus retain jurisdiction to interpret the terms of their property settlement agreements and to enforce them. *See Fackler v. Powell,* 839 N.E.2d 165 (Ind. 2005). Nevertheless, in essence this remains an exercise in the construction of the terms of a written contract, which is a pure question of law, so our standard of review is de novo. *See S.C. Nestel, Inc. v. Future Const., Inc.,* 836 N.E.2d 445 (Ind. Ct.App.2005).

We are called upon first to decide whether the following provision is ambiguous:

That the wife is awarded one-half of the value in the husband's 401(k) and one-half of the value in the husband's pen-sion plan as of this date and that the Court should enter a Qualified Domestic Relations Order (prepared by wife's attorney) to convey wife's interest in husband's pension and 401(k) plan. This Court retains jurisdiction to amend the Qualified Domestic Relations Order as may become necessary.

*Appellant's Appendix* at 9. The trial court agreed with Lester's claim that the foregoing is not ambiguous. According to that view, "the parties expressly agreed in the Property Settlement Agreement that the Wife's interest [in the account] was determined 'as of this date' (10 Mar. 03). This expressed language of a determination is clear as to date and financial interest." *Id.* at 28. The trial court concluded that the plain and ordinary meaning of this language is that Rosanne was entitled to exactly half of the amount that was in Lester's pension on March 10, 2003, regardless of when that amount was transferred into an account set up for her. That strikes us as a reasonable interpretation, but is it the *only* reasonable interpretation? That is, might it reasonably be construed to mean something else? We hold that it may.

We reiterate that the mere fact that Rosanne and Lester advocate differing interpretations of the provision in question does not render it, ipso facto, ambiguous. *University of S. Indiana Found. v. Baker,* 843 N.E.2d 528 (Ind.2006). Rather, the ambiguity arises because it is susceptible to more than one reasonable interpretation. *Magee v. Garry–Magee,* 833 N.E.2d 1083 (Ind.Ct.App.2005). Where an instrument is ambiguous, we will consider all relevant evidence, including extrinsic evidence, to discern the meaning of the instrument's provisions. *University of S. Indiana Found. v. Baker,* 843 N.E.2d 528. Ultimately, our goal is to determine the parties' intent in crafting those provisions,

and to effectuate that intent. *Magee v. Garry–Magee,* 833 N.E.2d 1083.

In the instant case, the provision was the result of the parties' efforts to divide their marital property, presumably in half. Although that does not necessarily mean they intended to divide each individual item of marital property into two equal parts, it is clear that such was the intent with this particular asset. Thus, the parties evinced an intention that each would own one-half of what had been Lester's individual pension account. That much seems uncontested. The controversy arises with respect to the qualifying phrase, "as of this date." *Appellant's Appendix* at 9. The identity of the date is not the issue. Both parties agree that it is March 7. The issue is, what was created "as of this date"? Lester contends, in effect, that the provision reflects an agreement that Rosanne would receive a sum certain from Lester's pension account, and that sum would equal one-half of the value of Lester's pension account on that day. According to Lester, that amount was forever immutable, and did not depend on circumstances such as when the funds were actually transferred to Rosanne. According to this view, the nature of the source of the funds was irrelevant; the parties had merely agreed that Rosanne would at some point receive $80,700.64 from Lester, an amount representing one-half of his 401(k) on March 7, 2003.

The fallacy in this view is that the nature of the source of the funds was far from irrelevant; it was, in fact, critical. The same provision setting forth the "as of this date" language also specified the manner of payment of this amount, i.e., "the Court should enter a Qualified Domestic Relations Order [QDRO] ... to convey

wife's interest in husband's pension plan." *Id.* (emphasis supplied). Clearly, Rosanne's interest was not in an amount of money in sum certain, but in a portion of Lester's pension plan—fifty percent, to be precise. To this end, the parties agreed that Rosanne's attorney would prepare a QDRO instructing Lester's pension carrier to transfer one-half of his pension to Rosanne. Rosanne's attorney did that, and in that QDRO instructed the carrier to pay Rosanne "a separate interest amount actuarially equivalent to the value of 50% of [Lester]'s accrued benefit." *Id.* at 15. Therefore, as of the date indicated (i.e., March 7), Lester's single account, in effect, became two accounts—one was Lester's and the other was Rosanne's. Part of the problem here is that said arrangement cannot be created at the unavoidable delay while the QDRO is prepared, approved, and sent, and thereafter processed administratively by the pension carrier. In the instant case, for reasons beyond Lester's control,[2] that delay period was even longer than is customary. This raises the question of how to allocate the change in value of the pension plan attributable to the period between execution of the Settlement Agreement and the implementation of its terms. We have explored this question in several recent cases.

Rosanne cites *Case v. Case,* 794 N.E.2d 514 (Ind.Ct.App.2003) in support of her argument. There, the trial court awarded approximately $40,000 of the husband's 401(k) plan to the husband and $50,000 to the wife. Approximately six weeks after the dissolution decree was entered, the husband moved to modify the decree because the value of the 401(k) plan had diminished from approximately $90,000 to approximately $67,000. Therefore, he ar-

---

2. That delay was attributable to a fact mentioned previously, i.e., that Lester's employer,

Bethlehem Steel, was going out of business.

gued, it would be impossible to make the awards specified in the decree. The court granted the husband's motion to modify the decree so that each party would receive their respective proportional shares of the now-diminished value of the pension. *Case* differed from the facts of this case in that the instant case involves a settlement agreement, whereas in *Case,* the disputed provision was not the product of agreement between the parties, but instead was ordered by the court after a contested hearing. Thus, it is of limited use because it does not involve principles of contract interpretation.

More closely analogous to the instant case is *Beike v. Beike,* 805 N.E.2d 1265. Like the instant case, *Beike* involved a settlement agreement and a provision therein dividing a pension. That provision stated, "The Parties have agreed that [the wife's] counsel will draft and process a QDRO reflecting that [she] is entitled to Thirty–Six percent (36%) of the value of [the husband's] vested pension as of the date of their separation, which was December 28, 1994." *Id.* at 1266. After the agreement was signed, but before the QDRO was entered, the pension decreased in value. The husband petitioned the court to construe this provision to mean that the value of his ex-wife's portion of the pension at the time the QDRO was entered included any diminution in the value of the pension account that was attributable to the period of time between the agreed-upon valuation date and the date the QDRO was executed (the interim period). The wife argued in *Beike,* as Lester does here, that the provision in question conferred upon her a sum certain amount, which was ascertained immutably as of the date indicated and unaffected by subsequent gains or losses in the account during the interim period due to market conditions. Citing *Niccum v. Niccum,* 734 N.E.2d 637 (Ind.Ct.App.2000), we held, "absent express language to the contrary,

the risks and losses associated with the pension plan should be borne by both parties as their respective interests were allocated by the trial court." *Beike v. Beike,* 805 N.E.2d at 1269.

This brings us to the case that is the focal point of the parties' respective arguments. In *Niccum,* parties to a dissolution entered into a settlement agreement, which the trial court approved. The provision in question stated, "That Petitioner's benefit plan and savings and investment program be put in a domestic relations order to be divided equally between the parties as of the value on May 14, 1997." *Niccum v. Niccum,* 734 N.E.2d at 639. The trial court approved the settlement agreement on March 31, 1998, by which time the value of the account had increased. After the parties filed competing motions on the subject, the trial court conducted a hearing on the question of whether the wife was entitled to share in the profits and losses that were attributable to the interim period. In October 1999, the trial court ordered that the wife was entitled to receive the continued growth on her share of the benefit plan and savings and investment program. *Niccum v. Niccum,* 734 N.E.2d 637. The husband appealed, presenting essentially the same argument that Lester does in the instant case, i.e., that because the parties agreed to a specific valuation date, Rosanne is not entitled to any growth on her portion of the pension plan during the interim period from the valuation date and the entry of the QDRO.

■ We considered that argument in *Niccum* and held, "[i]nvestment plans inherently include both the rewards of growth, and the risk of losses. Thus, absent express language stating otherwise, the settlement agreement of the parties implicitly contemplated both parties sharing all of the rewards and risks associated with an investment plan." *Id.* at 640. We explained:

The valuation date does not act to bar [the wife] from her entitlement to growth or loss in the investment and pension plans attributable to her share. Rather, the valuation date merely provides a mutually agreed upon base amount to which any growth is added or loss is subtracted, and bars [the wife] from benefiting from any contributions made by [the husband] after the valuation date.

*Id.* The principle that emerged from *Niccum* and has been applied since is that, "*absent express language stating otherwise,*" a settlement agreement dividing a pension plan implicitly contemplates that both parties will share all of the rewards and risks associated with an investment plan. *Id.* (emphasis supplied).

Lester contends that the language of the provision of the settlement agreement in this case does, in fact, constitute express language stating otherwise. We cannot agree. In the first place, it is substantially similar to the disputed provisions in *Niccum* and *Beike,* both of which were construed to confer upon both parties a right to share in profits and losses. We note especially that *Niccum* was decided well before the parties entered into the instant settlement agreement and thereby put Indiana citizens on notice that provisions of that sort would be interpreted in this manner. In the second place, it would have been easy enough to draft a provision utilizing language that unambiguously expressed an intention to award Rosanne an amount of cash in sum certain, as opposed to a portion of a pension plan. But, the parties did not do this. Instead, they agreed that Rosanne would be awarded a portion of Lester's pension plan, and that Rosanne's attorney would prepare a QDRO effectuating that intention. Rosanne's attorney did so. That order included the following instruction: "If the PBGC adjusts the Participant's benefit after PBGC approves this order, any reduction shall be applied by decreasing pro rata the Participant's and the Alternate Payee's benefits, and any increase shall be applied by increasing pro rata the Participant's and Alternate Payee's benefits." *Appellant's Appendix* at 15. The foregoing evinces an intention to share in any fluctuations in the account during the interim period.

In summary, we conclude that the provision in question is susceptible to more than one interpretation and therefore is ambiguous. In construing this ambiguity, we are confronted with the question whether the parties intended to share in the fluctuations of Lester's pension account during the interim period, or instead intended to confer upon Rosanne a sum certain at a future date. The best interpretation of the provision in question, as gleaned from the words employed in that provision and elsewhere in the Property Settlement, and consistent with *Niccum* and its progeny, is that Rosanne was entitled to an amount equal to one-half of the amount in Lester's pension fund as of March 7, 2003, plus any appreciation in value of that amount as of the date the QDRO became effective, or November 24, 2003. That amount is, or was on November 24, 2003, $90,711.13. The trial court erred in ruling to the contrary. This cause is remanded with instructions to enter an order assigning the parties' respective interests in what was formerly Lester's pension account, consistent with the principles set out in this opinion.

Judgment reversed and remanded with instructions.

MAY, J., and CRONE, J., concur.