## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 24 2018, 9:15 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Julianne L. Fox
Fox & Lutz, LLC
Evansville, Indiana

Brent M. Macer
Evansville, Indiana

ATTORNEY FOR APPELLEE

April L. Edwards
Boonville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

J.W.,

*Appellant-Petitioner,*

v.

C.W.,

*Appellee-Respondent.*

January 24, 2018

Court of Appeals Case No.
82A05-1707-DR-1700

Appeal from the Vanderburgh Superior Court

The Honorable Mary Margaret Lloyd Judge

Trial Court Cause No.
82D05-1511-DR-1499

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Petitioner, J.W. (Mother), appeals the trial court's Order, granting the motions of Appellee-Respondent, C.W. (Father), to amend the parties' Mediated Settlement Agreement and to hold Mother in contempt.

We affirm.

# ISSUES

Mother raises four issues on appeal, which we restate as the following five issues:

(1) Whether the trial court abused its discretion by excluding certain evidence related to academic testing of the parties' minor child;

(2) Whether the trial court erred in modifying the Mediated Settlement Agreement to require the parties' children to discontinue homeschooling;

(3) Whether the trial court erred by holding Mother in contempt for violating a parenting time order;

(4) Whether the trial court denied due process to Mother; and

(5) Whether the trial court abused its discretion by ordering Mother to pay a portion of Father's attorney fees.

Father raises one additional issue on appeal, which we restate as: Whether Father is entitled to an award of appellate attorney fees.

# FACTS AND PROCEDURAL HISTORY

[5] Father and Mother were married for over eleven years, during which time, three children were born: J.W., born September 16, 2009; Ja.W., born December 7, 2011; and H.W., born October 24, 2014 (collectively, the Children). Throughout their union, Father worked for a railroad company and owned/managed rental properties while Mother primarily stayed home to care for the Children. In addition, despite Father's reluctance about the matter, Mother elected to begin homeschooling J.W. and Ja.W. when they each reached approximately preschool age.

[6] On November 18, 2015, Mother filed a petition for dissolution of marriage. On April 29, 2016, the parties submitted a Mediated Settlement Agreement and Summary Decree of Dissolution (Mediated Agreement) to the trial court, and on May 2, 2016, the trial court issued a Decree of Dissolution. In pertinent part, the parties agreed to

> share joint legal custody with the Mother to be primary [physical] custodian of the minor [C]hildren. The [C]hildren will continue to be homeschooled according to the homeschool plan [Mother] has provided to [Father], however the parties reserve the right to litigate this issue if the [C]hildren do not meet annual achievement benchmarks for their age level. The Father shall be entitled to regular parenting time with [J.W. and Ja.W.] for alternate weeks from Friday at 4:00 p.m. to Sunday at 4:00 p.m. as well as mid-week parenting time for three hours after work on Tuesdays and Thursdays each week. The Father acknowledges that given his work schedule, mid-week overnights are not practical. Regular parenting time shall be phased in for the youngest child[, H.W.,] on the following schedule (progressing to

the next phase assuming no significant problems develop during the preceding phase):

a) The Tuesday/Thursday mid-week schedule shall be the same as the mid-week schedule for the older children;

b) For three months following the date of this [Mediated Agreement], the Father shall have parenting time with [H.W.] 8:00 a.m. to 4:00 p.m. on every Sunday. The Mother shall drive [H.W.] to the Father's home on Sunday morning, and the Father shall return [H.W.] to the Mother's home on Sunday evenings;

c) For the next three months, the Father shall have [H.W.] on alternate weeks (the same weekends as the older children), on Saturday from 8:00 a.m. to 4:00 p.m. and on Sunday from 8:00 a.m. to 4:00 p.m.;

d) For the next three months, the Father shall have one overnight on his alternating weekend, from Saturday at 8:00 a.m. to Sunday at 4:00 p.m.;

e) At the end of this phase in period, [H.W.] shall exercise alternating weeks along with the older children.

(Appellant's App. Vol. II, pp. 23-24). Additionally, the Mediated Agreement provided that

Father shall be entitled to . . . [fifteen] extra parenting days for the remainder of 2016, which can be used at any point throughout the year with [thirty] day[s'] notice (because the [C]hildren homeschool and are not subject to a traditional school calendar). The Father shall schedule his extended parenting time no more than three days consecutively (for a total of five days when combined with his weekend). Unless the Father is off work, the Mother shall have the [C]hildren during his work hours on his parenting days. Beginning in Summer 2017, the extended

parenting time shall follow the Indiana Parenting Time Guidelines.

(Appellant's App. Vol. II, p. 24).

[7] In October of 2016, Father inquired with Mother about utilizing his additional fifteen days of parenting time, noting that he was running out of time to do so before the end of the year. Mother indicated that she would check the terms of the Mediated Agreement, and Father raised the matter with her several more times in October and November, stating that "[i]f I'm supposed to give [thirty] days['] notice then I'll need to use all [fifteen] days in December. Probably the first and second week and a couple weekends." (Appellee's Exh. 1). After arguing back and forth about the matter, Mother ultimately informed Father that because his request was made too late in the year and because the additional parenting time would both interrupt homeschooling and usurp "practically the entire holiday season," they would "just continue with the schedule we have." (Appellee's Exh. 1).

[8] On December 8, 2016, Father filed a Verified Petition for Contempt, contending that Mother had refused his requests to schedule the additional fifteen days of parenting time to which he was entitled under the Mediated Agreement. Father also alleged that Mother denied his parenting time with H.W. over the extended Thanksgiving weekend. Father accused Mother of "using 'homeschooling' as an excuse to prevent [him] from having make up parenting time and other parenting time with the . . . [C]hildren." (Appellant's App. Vol. II, p. 35). Specifically, Father described that Mother claimed to be

"homeschooling the children year round" despite the terms of the Mediated Agreement, wherein "Mother agreed that her homeschooling would coincide with the school schedule in place for the Warrick County School District." (Appellant's App. Vol. II, p. 35).

[9] In response, on January 23, 2017, Mother filed a Verified Petition to Modify/Clarify the Mediated Settlement Agreement, which she amended on January 27, 2017, to clarify that the Mediated Agreement actually "was formulated around homeschooling year-round without specified dates in place for reference" and that Father had failed to timely utilize his additional fifteen days of parenting time in accordance with the Mediated Agreement's provision that such time could not be exercised "in increments of more than five (5) consecutive nights and was not to be stored up in order to exclude Mother from holidays." (Appellant's App. Vol. II, p. 39).

[10] At the beginning of 2017, Father became concerned about J.W.'s academic progress. Specifically, after Father enrolled J.W. in a first grade Bible study class at Father's church, J.W. indicated that he no longer wished to attend the class "because the other kids all read a lot better than I do." (Tr. Vol. II, p. 37). Father also observed that J.W. struggled to write numbers and letters. Father further feared that homeschooling would be detrimental for the Children's social skills, and he favored public school so that he could "keep up better with [J.W.'s] schooling." (Tr. Vol. II, p. 39).

Also around this time, Mother began reporting concerns that the Children, particularly J.W. and H.W., exhibited behavioral changes and anxiety surrounding their parenting time with Father. Mother described that

> [a]fter three months of having one overnight with [Father], each time [H.W.] would return home looking like a different child in my opinion, but I mean she just didn't look like herself, was unclean, unkept, she was hungry, she was thirsty, she was very, very[] tired, she was not happy, she had difficulty making eye contact, didn't engage like she normally would, she just didn't seem like herself.

(Tr. Vol. II, pp. 205-06). Mother also described that H.W. "suddenly began waking up frequently in the middle of the night with expressions of fear naming her [F]ather." (Tr. Vol. II, p. 206). In addition, Mother stated that J.W. was fearful of Father and would cry to the point of dry heaving prior to Father's parenting time. By the end of January 2017, H.W. should have progressed to the same parenting time schedule as J.W. and Ja.W., which consisted of two mid-week visits for three hours and from Friday at 4:00 p.m. to Sunday at 4:00 p.m. on alternating weekends. Up to this point, H.W. had been participating in the mid-week visits and was only spending one night with Father on the alternating weekends. However, Mother objected to progressing to the final phase of the modified parenting time arrangement for H.W. based on her belief that Father was possibly abusing or neglecting the Children. In February of 2017, Mother arranged for all three Children to begin therapy.

[12] On February 23, 2017, Father filed a Second Verified Petition for Contempt, this time asserting that Mother failed to abide by the Mediation Agreement's phase-in parenting time schedule for H.W. On March 17, 2017, Mother filed an Emergency Petition to Restrict Parenting Time because "the [C]hildren exhibit extreme anxiety concerning parenting time with . . . Father such that an emergency exists." (Appellant's App. Vol. II, p. 45). Mother requested that "parenting time should not be overnight" until "the therapists have the opportunity to attend to the concerns in this case." (Appellant's App. Vol. II, p. 45). The trial court heard argument by counsel and denied the emergency petition.

[13] On March 30, 2017, Father filed his Third Verified Petition for Contempt, contending, in relevant part, that Mother refused to allow H.W. to spend Spring Break with Father. That day, Father also filed a Motion to Compel Testing to ascertain whether J.W. was meeting the educational benchmarks for his age, as well as a Motion for Modification of Mediated Settlement Agreement to require that the Children discontinue homeschooling in light of a concern that J.W. was "behind in his education." (Appellant's App. Vol. II, p. 53).

[14] On April 21, 2017, the trial court held a hearing and subsequently granted Father's request to have J.W. academically tested. On May 9, 2017, the principal of Cynthia Heights Elementary School, part of the Evansville Vanderburgh School Corporation, administered "a battery of tests" based on the fact that, for J.W.'s age, he typically "would just have finished up first grade" and "would be going into second grade" at the start of the school year.

(Tr. Vol. II, pp. 7-8). In reading, J.W. tested at the level of "a first grader at the third month." (Tr. Vol. II, p. 8). Specifically, he tested in the "20th percentile and what that means is that 80% of the kids at his level are higher than him, and 19% are lower than him, for his age." (Tr. Vol. II, p. 9). For language, J.W. tested "at a grade equivalent of about a first grader, the eight[h] month, so more towards the end of first grade" in the "46th percentile, so he's about in the mid-point." (Tr. Vol. II, p. 9). Finally, despite "ample time" to complete all of the testing, J.W. was unable to finish the math portion of the exam. (Tr. Vol. II, p. 10). The school principal noted that she "often had to keep [J.W.] . . . motivated" throughout the testing. (Tr. Vol. II, p. 10). The principal ultimately concluded that J.W. is "behind grade level. . . . [H]e is not where he needs to be where other second graders are." (Tr. Vol. II, p. 15).

[15]     On the other hand, Mother consulted homeschool resources and opted to personally administer the "California Achievement Test," which she described as "a nationally recognized standardized test," to evaluate J.W.'s academic performance in the areas of reading, language arts, and math. (Tr. Vol. II, pp. 241, 244). Over two days, Mother administered the online test in her home and recorded the process. Throughout the testing, Mother had to motivate J.W. to continue. She provided guidance on the testing instructions and even read all of the passages and answer options aloud in the reading section of the test. J.W. repeatedly expressed his fear of incorrectly answering, indicated that there were aspects of the test that he had never before seen, and repeatedly looked to Mother for prompts and reassurance. Nevertheless, Mother reported that "[t]he

results showed that [J.W.] was at at least a 2nd grade level in reading, language arts, and math." (Tr. Vol. II, p. 242).

[16] On May 11, 2017, Mother filed a Renewed Motion to Restrict Parenting Time, again claiming that "the [C]hildren are exhibiting extreme anxiety concerning parenting time" and requesting that "parenting time be restricted to not include overnights or limit the number of overnights permitted consecutively." (Appellant's App. Vol. II, p. 59). Mother argued that the parties are unable to communicate and indicated that she was requesting an award of sole legal custody. On May 24, 2017, Mother filed a motion to withdraw her petitions filed on January 23, 2017, January 27, 2017, and May 11, 2017 (for clarification of the Mediated Agreement and restricted parenting time), and filed a specific motion for modification of custody. Mother alleged that there had "been a substantial and continuing change in circumstances such that the current order [was] no longer in the best interest of the [Children]." (Appellant's App. Vol. II, p. 75). Mother requested that she be granted sole legal custody and that Father's parenting time be restricted based on her belief that "overnight parenting time with Father is endangering the [C]hildren's physical health and/or their emotional well being is being significantly impaired as the [C]hildren exhibit extreme anxiety concerning parenting time with the Father, have described concerning events to the therapists, and refer to being afraid or scared of Father." (Appellant's App. Vol. II, pp. 75-76). On May 25, 2017, Father objected to the withdrawal of Mother's motions in lieu of a motion to modify custody. With the hearing set for less than a week away, Father argued

that Mother's newly stated legal position would cause him prejudice. Although the record is unclear, it does not appear that the trial court granted Mother's motion to withdraw her prior petitions; instead, the trial court scheduled Mother's motions to modify custody and to restrict parenting time for a hearing on August 21, 2017.

[17] On June 1 and 7, 2017, the trial court conducted a hearing on Father's three contempt motions and his motion to modify the Mediated Agreement regarding the Children's schooling, as well as Mother's request for an interim order on restricted parenting time. With respect to the Children's education, Father and Mother each submitted their divergent evidence concerning J.W.'s test scores. Regarding parenting time, Mother submitted video recordings that depicted J.W. and H.W. upset in anticipation of, and sometimes after, parenting time with Father, whereas Father submitted video evidence demonstrating that the Children do not exhibit emotional distress during his parenting time. Father further submitted notes from the Children's therapy sessions, wherein J.W. and Ja.W., in varying terms, spoke negatively of Father and expressed not wanting to spend time with him. However, J.W. also indicated to the therapist that some of his feelings were based on things that "[Mother] told him"—including, in part, that "[Father] pretends to be nice but is mean." (Appellee's Exh. 8a).

[18] On July 18, 2017, the trial court issued an Order. The trial court granted Father's request that Mother discontinue homeschooling for J.W. and Ja.W., instead finding it to be in their best interest to attend public school. The trial court further found Mother to be in contempt for "willfully and intentionally"

violating the court's prior order regarding parenting time. (Appellant's App. Vol. II, p. 4). Specifically, the trial court found that Mother had denied the extra fifteen days of parenting time to which Father was entitled, and Mother withheld overnight parenting time with H.W. in accordance with the phase-in parenting time arrangement. As a consequence for Mother's contempt, the trial court ordered her to pay $5,000 toward Father's attorney fees. The trial court also entered an "Interim Order" for parenting time, which provided that H.W. would be on the same parenting time schedule as J.W. and Ja.W., that Father would have the Children for a sixteen-day block during the summer, and that Father would be entitled to have an additional seven weekends of parenting time to make up for the days that he was denied. (Appellant's App. Vol. II, p. 6). The trial court ordered the parties to appear on August 21, 2017, "for further hearing on [Mother's] request for restricted parenting time[] and Petition to Modify Custody." (Appellant's App. Vol. II, p. 7).

[19] On July 19, 2017, Mother filed a motion to withdraw her motion for sole legal custody, and on July 22, 2017, she filed an emergency petition to stay the trial court's July 18, 2017 Order. The trial court denied her motion to stay on July 24, 2017. On July 27, 2017, Mother filed her Notice of Appeal. Then, on August 1, 2017, she moved to dismiss her motion for restricted parenting time, which the trial court granted on August 2, 2017. The trial court subsequently vacated the August 21, 2017 hearing date.

[20] Mother now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

In this case, the trial court's Order includes *sua sponte* findings of fact and conclusions thereon. In accordance with Indiana Trial Rule 52(A), our court "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." On review, "we look only to whether the evidence supports the findings, and then whether the findings support the judgment, without reweighing the evidence or reassessing witness credibility." *In re Marriage of Gertiser*, 45 N.E.3d 363, 369 (Ind. 2015) (internal citation omitted). The trial court's findings "are controlling unless the record contains 'no facts to support them either directly or by inference.'" *Id.* Legal conclusions, on the other hand, are reviewed *de novo*. *Id.* As to any issues not covered by the trial court's findings, we apply a general judgment standard and will "affirm based on any legal theory supported by the evidence." *Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016).

Furthermore, our court will adhere to a long-established preference "for granting latitude and deference to our trial judges in family law matters." *Id.* "Appellate courts 'are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence.'" *Id.* (quoting *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002)). Thus, on appeal, "it is not enough

that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal." *Id.* (quoting *Kirk*, 770 N.E.2d at 307).

## II. *Admission of Evidence*

[23] Mother claims that the trial court abused its discretion by excluding the results of the California Achievement Test from evidence. It is well established that trial courts have sound discretion to admit or exclude evidence. *D.B.M. v. Ind. Dep't of Child Servs.*, 20 N.E.3d 174, 178-79 (Ind. Ct. App. 2014), *trans. denied*. We will find an abuse of the trial court's discretion if its decision is contrary to "the logic and effect of the facts and circumstances before it." *Id.* at 179. Even where the trial court errs in an evidentiary decision, our court will only reverse "if we conclude the admission [or exclusion] affected a party's substantial rights." *Id.*

[24] During the hearing, Mother submitted a flash drive, Exhibit C, which was admitted into evidence without objection. Among the files on the flash drive are video recordings of Mother administering the California Achievement Test to J.W., as well as a copy of the test results. Mother also testified that the results of the California Achievement Test demonstrated that J.W. was then performing at a second grade level. Later in the hearing, Mother sought to specifically admit Exhibit F, "the achievement testing results." (Tr. Vol. II, p. 248). Father objected based on a lack of foundation for the document, citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and arguing that Mother "has no educational background, she's not testified that she's ever

administered [an] achievement test before, she has not demonstrated that this particular test was appropriate for a [seven] year old, that it's commonly used, commonly accepted to provide accurate results." (Tr. Vol. II, pp. 248-49). Mother now claims that the trial court erroneously excluded "hard copies of the results" despite admitting the electronic version contained on the flash drive. (Appellant's Br. p. 10).

[25] Here, we need not address the *Daubert* and Indiana Evidence Rule 702 arguments presented by the parties as to whether the evidence was properly excluded or if the reliability of the test results should simply have impacted the evidentiary weight accorded by the trial court. Mother testified as to how she selected the California Achievement Test, how she administered the test (including video footage), and specifically to the results of the California Achievement Test. Thus, any error in the denial of admission of the document[1] would be harmless as it is "merely cumulative" of Mother's testimony. *D.B.M.*, 20 N.E.3d at 179 ("In general, the admission of evidence that is merely cumulative of other evidence amounts to harmless error as such admission does not affect a party's substantial rights.").

---

[1] Again, we reiterate that the results of the California Achievement Test were, in fact, included on the flash drive, which was admitted in its entirety without objection. Thus, it is not entirely clear what evidence, if any, was excluded or why this matter is now before our court.

### III. *Modification of Mediated Agreement: Homeschooling*

[26] Mother claims that the trial court erred by modifying the Mediated Agreement to require that the Children attend public school. In a dissolution proceeding, "parties are free to draft their own settlement agreement" which is "contractual in nature" and "binding upon the parties." *Shorter v. Shorter*, 851 N.E.2d 378, 382-83 (Ind. Ct. App. 2006). Thus, the general rules governing contracts are also applicable to settlement agreements. *Id.* at 383. As with other contracts, interpretation of a settlement agreement "generally presents a question of law" and is reviewed *de novo*. *Johnson v. Johnson*, 920 N.E.2d 253, 256 (Ind. 2010); *Zan v. Zan*, 820 N.E.2d 1284, 1287 (Ind. Ct. App. 2005). Where a settlement agreement's terms are clear and unambiguous, they "are deemed conclusive," and we "will not construe the contract or look to extrinsic evidence, but will merely apply the contractual provisions." *Shorter*, 851 N.E.2d at 383. "Terms are not ambiguous merely because the parties disagree as to the proper interpretation of those terms." *Id.*

[27] Pursuant to the Mediated Agreement, Father and Mother originally agreed that the Children would "continue to be homeschooled according to the homeschool plan [Mother] . . . provided to [Father], however the parties reserve the right to litigate this issue if the [C]hildren do not meet *annual achievement benchmarks for their age level*." (Appellant's App. Vol. II, p. 23) (emphasis added). The trial court concluded that the academic evidence presented established that J.W. was "not achieving the annual achievement bench marks for his age level by [Mother] homeschooling him. Furthermore, since [Mother]

by her own words finds [Ja.W.'s] aptitude [to be 'like J.W.'],'" the trial court ordered that it would serve the best interests of both J.W. and Ja.W.[2] to attend public school (or private school if so agreed by the parties). (Appellant's App. Vol. II, p. 4).

[28] In support of its decision, the trial court relied on the testimony of the Cynthia Heights Elementary School principal that J.W., who should be entering second grade based on his age, was "behind grade level." (Tr. Vol. II, p. 15). In reading, J.W. tested at the level of "a first grader at the third month"—specifically, in the 20th percentile compared to his peers. (Tr. Vol. II, p. 8). For language, J.W. tested "at a grade equivalent of about a first grader, the eight[h] month, so more towards the end of first grade"—in the 46th percentile. (Tr. Vol. II, p. 9). Finally, despite "ample time" to complete all of the testing, J.W. was unable to finish the math portion of the exam. (Tr. Vol. II, p. 10). The trial court noted the principal's testimony that she had to continually motivate J.W. to complete the testing. In addition, the trial court considered Mother's evidence that J.W. was "working at a second grade level in all areas." (Appellant's App. Vol. II, p. 4). Yet, the trial court discussed that throughout Mother's video recordings of J.W. taking the California Achievement Test, J.W. "appear[ed] anxious, stressed and at one point beg[an] to tear up." (Appellant's App. Vol. II, p. 4). The trial court further observed that "[a]t one

---

[2] At the time of these proceedings, only J.W. and Ja.W. were homeschooled as H.W. had not yet reached school age.

point" during the California Achievement Test, J.W. "remark[ed], 'I usually don't do this type of math[,]' [t]o which[ Mother] replied, 'that's not true.'" (Appellant's App. Vol. II, p. 4).

[29] Mother now argues that

> [t]he [trial] court relied solely upon . . . [the testimony of the Cynthia Heights Elementary School principal] regarding [J.W.'s] age in regard to the Evansville Vanderburgh School Corporation policy, not upon the statute regarding mandatory school attendance and solely discounting her testimony regarding her lack of knowledge on statutory age being seven for mandatory attendance. Moreover, although the court acknowledged Mother's Exhibit C regarding [J.W.] taking the California Achievement Test, the court discounted the results included on the Exhibit C[] thumb drive which was admitted without objection.

(Appellant's Br. p. 10) (internal citation omitted). Concerning her mandatory school age argument, Mother cites Indiana Code section 20-33-2-8, which provides that "[a] student is not bound by the requirements of [compulsory school attendance] until the student becomes seven (7) years of age." Thus, by age seven, "the parent of a student who would otherwise be subject to compulsory school attendance" must certify to the superintendent of the applicable school corporation that the parent intends to either enroll the student in a non-accredited, non-public school or to "begin providing the student with instruction equivalent to that given in the public schools." I.C. § 20-33-2-8.

[30]     The plain language of the Mediated Agreement allows re-litigation of the homeschooling issue if the Children fail to reach "annual achievement benchmarks for their age level." (Appellant's App. Vol. II, p. 23). Mother asserted during the hearing that because J.W. was not even *required* to begin school until age seven, regardless of whether he was testing at a first or second grade level, he satisfied the benchmarks for a seven-year-old. We disagree. A child may enroll in kindergarten if he is "at least five (5) years of age on August 1 of the school year." I.C. § 20-33-2-7. As the Cynthia Heights Elementary School principal testified, for a seven-year-old child (who would turn eight during the school year), the public school system would generally expect J.W. to be completing second grade work and, in fact, would automatically have enrolled J.W. in second grade based on his age alone. According to Indiana Code section 20-33-2-8, in a homeschool setting, Mother would be required to provide the equivalent instruction that a public school would provide to a seven-year-old. Based on the testing administered by the Cynthia Heights Elementary School principal, J.W. was performing below this level. Any argument as to whether J.W. was, in fact, performing at a first or second grade level based on the varying academic tests administered would amount to a request for reweighing of the evidence, which we will not do. Instead, we conclude that there is evidence in the record that J.W. was performing below his benchmark to support the trial court's decision to order that homeschooling be discontinued.

## IV. *Contempt: Parenting Time*

[31] Mother next claims that the trial court erred by finding her in contempt based on her denial of Father's parenting time. "Whether a person is in contempt of a court order is a matter within the trial court's discretion." *Paternity of J.W. v. Piersimoni*, 79 N.E.3d 975, 981 (Ind. Ct. App. 2017). We will overturn a finding of contempt only for an abuse of discretion—that is, if the trial court's decision is against the logic and effect of the facts and circumstances before it. *Clary-Ghosh v. Ghosh*, 26 N.E.3d 986, 993 (Ind. Ct. App. 2015), *trans. denied*. A finding of contempt is proper where a party willfully disobeys any lawfully entered court order. *Id.* In this case, Mother bears the burden of demonstrating that her violation of the trial court's parenting time order, as set forth in the Mediated Agreement and incorporated into the divorce decree, "was not willful." *Id.* On appeal, Mother only challenges the trial court's finding of contempt with respect to her denial of Father's parenting time with H.W. in accordance with the phase-in schedule; she does not claim any error in the trial court's finding of contempt related to the denial of Father's extra fifteen days of parenting time.

[32] "The right of a non-custodial parent to visit with his or her children is a sacred and precious privilege, and, ideally, a child should have a well-founded relationship with both parents." *In re Paternity of P.B.*, 60 N.E.3d 1092, 1098 (Ind. Ct. App. 2016). In this case, Father and Mother mutually agreed that H.W.'s phase-in parenting time would proceed on schedule "assuming no significant problems develop[ed] during the preceding phase." (Appellant's

App. Vol. II, p. 23). By February of 2017, H.W. had been spending one overnight at Father's house on alternating weekends for at least three months, and she was scheduled to begin spending two nights on alternating weekends—*i.e.*, to be on the same parenting time schedule as J.W. and Ja.W. As the trial court found, Mother did not agree "to phase beyond one (1) overnight because [H.W.] had changes in behavior, appearance, and sleep. [Mother] added that after overnights[,] [H.W.] was hungry, thirsty, dirty, made no eye contact, was not like herself, and was out of sorts." (Appellant's App. Vol. II, p. 5). Nevertheless, the trial court determined that based on

> the evidence to date, and with the understanding that the [c]ourt will receive further evidence including the therapists of the [C]hildren at the next hearing date, the [c]ourt does not find the evidence presented shows any "significant problems" have developed in the phase-in period to justify [H.W.'s] parenting time being different from her brothers.

(Appellant's App. Vol. II, p. 5). Rather, Mother "willfully and intentionally denied overnights of [H.W.] to [Father]." (Appellant's App. Vol. II, p. 5).

[33] Mother now contends that she "has never waivered in her assertion that 'significant problems' occurred with the phasing in of overnights such that the last phase of parenting time should not occur." (Appellant's Br. p. 12). "[W]ithout prior notification as to what the trial court would consider 'significant,' Mother [argues that she] cannot be held in contempt if she genuinely held the belief the problems were significant." (Appellant's Br. p. 12). In turn, Father argues that the trial court properly found Mother to be in

contempt because Mother's "subjective belief that there were significant problems that should have prevented H.W. from completing the phase[-]in parenting time with her Father is not enough nor is it even credible in light of the other testimony and evidence." (Appellee's Br. pp. 20-21). Specifically, Father points out that the therapy records indicate that "the only thing negative documented was Mother's conduct of saying negative things about Father to the [C]hildren," and "Father's videotapes and testimony directly contradicted that there were any problems." (Appellee's Br. p. 20).

[34] We cannot say that the trial court abused its discretion. Mother submitted video evidence of J.W. and H.W. crying in anticipation of their parenting time with Father, and she recorded conversations with J.W. and H.W., wherein two-year-old H.W. referred to Father as "scary," "mean," and "hateful," and wherein seven-year-old J.W. alleged, in part, that Father had punched him[3] and criticized him for his academic performance. (Appellant's Exh. C). Mother also testified that J.W. and H.W. experienced sleep and digestive issues and anxiety in relation to their parenting time with Father, and she surmised that H.W.'s aggressive play with one of her dolls was indicative of H.W. acting out her fears of Father. In turn, Father submitted video evidence of the Children playing normally and having fun during his parenting time. He acknowledged that J.W. and H.W. are sometimes reluctant at the beginning of parenting time, but that their emotions quickly fade and the Children do not have problems

_____

[3] Mother acknowledged that she observed no bruises or other evidence of physical abuse.

while in his care. Father also presented notes from the Children's therapy sessions, in which there is evidence that the Children's negative comments about Father may stem from their conversations with Mother rather than their actual experiences. It was incumbent upon the trial court to consider and weigh the conflicting evidence and make credibility determinations, and we do not interfere with those decisions. *See Clary-Ghosh*, 26 N.E.3d at 993 (noting that, in reviewing a contempt finding, the appellate court does not reweigh evidence or judge the credibility of witnesses). Here, the trial court clearly accorded credibility to Father's evidence establishing that there are no "significant problems" to warrant delaying H.W.'s parenting time schedule. (Appellant's App. Vol. II, p. 23). Absent "a firm and definite belief that a mistake has been made" in holding Mother in contempt, we now affirm the trial court. *Clary-Ghosh*, 26 N.E.3d 986 at 993.

## V. *Due Process*

[35] Mother claims that the trial court violated her right to due process by "prematurely order[ing] a modification of parenting time and foreclos[ing] upon Mother's Motion for Restricted Parenting Time set before the court on August 21, 2017." (Appellant's Br. p. 13). In other words, Mother contends that she had moved "to restrict Father's parenting time on two occasions, and the issue was set for August 21, 2017." (Appellant's Br. p. 13). According to Mother, the trial court could not determine that significant issues had arisen with respect to H.W.'s phase-in parenting time schedule until the therapists testified at the August 21, 2017 hearing.

[36] We are perplexed by Mother's argument. At Mother's request, the trial court entered an interim parenting time order pending the hearing on Mother's motions to restrict Father's parenting time and for sole legal custody. The interim parenting time order honored the original Mediated Agreement's intent that H.W. would eventually maintain the same parenting time schedule as J.W. and Ja.W. As to whether any significant issues had arisen to prevent H.W. from progressing to the final phase of her modified parenting time schedule, the trial court found Mother in contempt based on the evidence presented— namely, that Mother had unilaterally determined to restrict Father's parenting time based on her unsupported perception of "significant problems." (Appellant's App. Vol. II, p. 23). The contempt issue was squarely before the trial court, but Mother did not call the Children's therapists to testify in support of her position that she did not willfully violate the parenting time order. Moreover, because Mother subsequently moved for dismissal of her motion to restrict parenting time, the trial court vacated the August 21, 2017 hearing date. Therefore, we ultimately find that Mother has waived any due process argument for our review.

## VI. *Attorney Fees*

[37] Lastly, Mother claims that the trial court erroneously ordered her to pay Father's attorney fees. A "trial court has inherent authority to award attorney fees for civil contempt." *Clary-Ghosh*, 26 N.E.3d at 995. An award of attorney fees is reviewed on appeal under the abuse of discretion standard, and we will reverse only if the trial court's decision is clearly against the logic and effect of

the facts and circumstances before the court. *Bessolo v. Rosario*, 966 N.E.2d 725, 733 (Ind. Ct. App. 2012), *trans. denied*.

[38] "The objective of a contempt citation is not to punish but to coerce action for the benefit of the aggrieved party. Thus, any type of remedy in civil contempt proceedings must be coercive or remedial in nature." *Kahn v. Baker*, 36 N.E.3d 1103, 1114 (Ind. Ct. App. 2015), *trans. denied*. Because of a trial court's inherent authority to enforce compliance with its order and decrees, no statutory sanction is required "to compensate the aggrieved party for losses and damages resulting from another's contemptuous actions." *Id.* at 1116. Nonetheless, Indiana Code section 31-17-7-1 specifically authorizes a trial court to "order a party to pay a reasonable" attorney fees related to maintaining or defending an action involving parenting time rights.

> In assessing attorney's fees, the trial court may consider such factors as the resources of the parties, the relative earning ability of the parties, and other factors bearing on the reasonableness of the award. In addition, any misconduct on the part of a party that directly results in the other party incurring additional fees may be taken into consideration.

*Bessolo*, 966 N.E.2d at 733. A trial court is not obligated to give its reasons for its decision to award attorney fees. *Id.*

[39] Here, Father presented evidence that he had expended $10,641.39 in attorney fees to pursue modification of the homeschooling arrangement and to establish Mother's contempt. Based on its finding of Mother's contempt, the trial court "ordered [her] to pay $5,000.00 of [Father's] attorney fees. She shall pay

$500.00 twice per month on the first and fifteenth day of each month until paid in full." (Appellant's App. Vol. II, p. 6). Mother now complains that the trial court failed to acknowledge whether she "had the ability to pay or her resources." (Appellant's Br. p. 14). Mother contends that the child support worksheet, attached to the Mediated Agreement, demonstrates that her weekly income is $500.00, which is "four times" less than Father's income. (Appellant's Br. p. 14). Thus, she contends that to "tak[e] away a full week's wages" is "punitive in nature." (Appellant's Br. p. 14).

[40] A review of the child support worksheet indicates that Mother's income, at the time the parties were divorced in April of 2016, was actually $300.00 per week, whereas Father was earning $1,285.00 per week. In text messages exchanged between Mother and Father, it does appear that Mother is now employed in some fashion on at least a part-time basis, but no other evidence was presented concerning her current income. Nevertheless, the parties' Mediated Agreement was part of the record, and, in addition to the child support worksheet, it discussed the distribution of marital assets. Specifically, there was evidence before the trial court that Mother, as part of the divorce, received over $33,000 from the parties' joint account. As Mother's misconduct was the basis for the attorney fee award, it was certainly the trial court's prerogative to order the payment of attorney fees. Moreover, because "we assume" that the trial court considered the financial information set forth in the Mediated Agreement in awarding the attorney fees, we find no abuse of discretion. *Bessolo*, 966 N.E.2d at 733.

## VII. *Appellate Attorney Fees*

Father claims that he is entitled to an award of appellate attorney fees pursuant to Indiana Appellate Rule 66(E). Our court is authorized to "assess damages if an appeal, petition, or motion, or response, is frivolous or in bad faith. Damages shall be in [our] discretion and may include attorneys' fees." Ind. Appellate Rule 66(E). "Our discretion to award attorney fees . . . is limited, however, to instances when an appeal is permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay." *Thacker v. Wentzel*, 797 N.E.2d 342, 346 (Ind. Ct. App. 2003). We exercise "extreme restraint when exercising this power because of the potential chilling effect upon the exercise of the right to appeal." *Id.*

Father claims that "there simply was not any legitimate legal basis for this appeal and . . . that Mother has brought this appeal in bad faith and to further harass him and cost him money." (Appellee's Br. p. 27). Generally, claims for appellate attorney fees are "formally categorized" into either "substantive" or "procedural" bad faith claims. *Thacker*, 797 N.E.2d at 346. Father's claim concerns substantive bad faith, and to prevail, he must demonstrate that Mother's "contentions and arguments are utterly devoid of all plausibility." *Id.* Here, Father argues that Mother's arguments primarily amount to requests for reweighing of evidence, ignore her failure to take advantage of opportunities to be heard and present evidence, overlook her own actions in withdrawing motions, and ignore the applicable abuse of discretion standard. While some of Mother's arguments are underdeveloped and certainly meritless, we are mindful

of the chilling effect of appellate attorney fees. Furthermore, we do not find that all of Mother's arguments are so devoid of plausibility as to warrant appellate attorney fees. Specifically, we note that Mother's argument regarding the application of the statute regarding mandatory school age was a novel and interesting approach that, based on our *de novo* review, *could have* worked in her favor. Accordingly, we decline Father's request.

## CONCLUSION

[43] Based on the foregoing, we conclude that the trial court did not err in modifying the Mediated Agreement to require the Children to discontinue homeschooling, and any error in the exclusion of academic testing evidence would be considered harmless. We further conclude that the trial court acted within its discretion in finding Mother to be in contempt and ordering her to pay attorney fees as a result. Mother has waived any claim regarding a violation of due process. Finally, we conclude that Father is not entitled to an award of appellate attorney fees.

[44] Affirmed.

[45] Baker, J. and Brown, J. concur