

FILED

Nov 16 2018, 9:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jonathan R. Deenik
Deenik Law, LLC
Greenwood, Indiana

ATTORNEY FOR APPELLEE

Janice Mandla Mattingly
Janice Mandla Mattingly, P.C.
Carmel, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kimberly L. Eads,<br>*Appellant-Petitioner,*<br><br>v.<br><br>Robert J. Eads, Jr.,<br>*Appellee-Respondent* | November 16, 2018<br><br>Court of Appeals Case No.<br>18A-DR-249<br><br>Appeal from the Johnson Superior<br>Court<br><br>The Honorable Peter D. Nugent,<br>Judge<br><br>Trial Court Cause No.<br>41D02-1110-DR-779 |

**Vaidik, Chief Judge.**

## Case Summary

In October 2011, Kimberly L. Eads ("Wife") filed a petition to dissolve her marriage to Robert J. Eads ("Husband"). Nearly six years later, in July 2017, the trial court issued a decree dissolving the parties' marriage. In the decree, the court used a coverture fraction to determine that 77.2% of Husband's

firefighters' pension was earned during the marriage. The court then ordered Husband, once he retires, to forward half of 77.2%, or 38.6%, of his monthly pension payment to Wife each month and then issue her a Form 1099-R (an IRS form for distributions from pensions and retirement plans) so that Wife pays the taxes on her share of his pension. In addition, the court found that Wife, who receives social-security disability payments for injuries she sustained in a car accident, is entitled to rehabilitative maintenance and ordered Husband to pay her $1000/month for twenty-four months. Finally, the court ordered each party to pay their own attorney's fees.

[2] Both Husband and Wife now appeal. We conclude that the trial court erred in calculating the coverture fraction because it included pension rights that Husband earned after Wife filed for divorce. We therefore remand this case with instructions for the court to apply one of two methods—the date-of-retirement approach or the date-of-divorce approach—to determine the portion of Husband's pension that was earned during the marriage. We also conclude that the trial court erred in ordering Husband to issue Wife a Form 1099-R each year and therefore order the court to consider different options of making Wife responsible for the taxes on her share of Husband's pension. Although we find no abuse of the trial court's discretion in ordering each party to pay their own attorney's fees, we find that the record does not support an award of rehabilitative maintenance. On remand, the court must determine whether Wife is entitled to incapacity maintenance instead of rehabilitative maintenance. We therefore affirm in part and reverse and remand in part.

# Facts and Procedural History

[3] Although the dissolution decree covers many topics, this appeal concerns only a few of them. Accordingly, we set forth the facts that are relevant to the issues the parties raise on appeal.

[4] Husband began working as a firefighter on February 7, 1994. As a firefighter, Husband is a member of the 1977 Police Officers' and Firefighters' Pension and Disability Fund ("1977 Fund"), which is administered by the Indiana Public Retirement System (INPRS). Appellant's App. Vol. II p. 23 (Finding 37); *see also Thatcher v. City of Kokomo*, 962 N.E.2d 1224, 1225 n.1 (Ind. 2012) ("The '1977 Fund' is a disability and pension fund for police officers and firefighters established by Indiana Code section 36-8-8-4 that is managed by [INPRS]."). Members of the 1977 Fund become vested with twenty years of service and are eligible for an unreduced retirement benefit when they have twenty years of service, are at least fifty-two years old, and have separated from service. Appellant's App. Vol. II p. 23 (Finding 37); *see also* Ex. 1. Unlike other pensions, the 1977 Fund pension is not subject to a Qualified Domestic Relations Order (QDRO).[1]

---

[1] According to INPRS,

> The fund is not required by federal law to honor [QDROs]. The 1977 Fund is not authorized by law to split payments between payees. . . . The Fund will not make any payments directly to a Fund Member's alternate payee under a QDRO. . . . The Fund will also not make any payments prior to the time that distributions would otherwise begin to the member by law. This means that the member must have actually retired or

[5] About three-and-a-half years after Husband began working as a firefighter, on November 15, 1997, Husband and Wife married. In 2000, Wife was involved in a car accident and sustained back injuries. *See* Tr. Vol. II p. 9 (Wife testifying that her back injuries prevent her from sitting, standing for long periods of time, and concentrating and that her medications make her sleepy). Wife, who worked as a finance manager before the accident, has not worked since the accident. *Id.* Wife was eventually awarded social-security disability payments dating back to 2000. In 2002 and 2003, Husband was "medically retired" due to an injury. Appellant's App. Vol. II p. 23 (Finding 39); Tr. Vol. III p. 177. Husband then returned to work.

[6] On October 25, 2011—which was before Husband, then age forty-five, became vested in his 1977 Fund pension—Wife filed for divorce.[2] In the petition, Wife requested spousal maintenance. Tr. Vol. II pp. 95-97. After Wife filed for divorce, Husband and Wife did not live together or commingle assets. The

separated from employment from a 1977 Fund covered position in order for the Fund to begin making payments to the member.

Ex. 2C.

[2] According to INPRS, on October 25, 2011, Husband "was not vested in a pension benefit"; however, if Husband separated from employment on October 25, 2011, "he could have withdrawn his member contribution account balance," which at that time was approximately $67,853.45. Ex. 2C; *see also* Tr. Vol. II pp. 216-17. After becoming vested, however, Husband cannot withdraw his member contributions "because [they] are used to fund the 1977 pension benefit." Ex. 2C.

divorce was pending for nearly six years. During this time, Husband reached twenty years of service and thus became vested in his pension.

[7] The final hearing was held over the course of three days between December 2016 and February 2017. Husband was still working and thus continuing to accrue pension benefits. At the hearing, substantial time was devoted to Husband's 1977 Fund pension, as it was one of the parties' two major assets (the other being the marital residence). Wife presented evidence from Dan Andrews, a Franklin College business and accounting professor and a CPA. Specifically, Andrews testified that Husband's monthly benefit amount (calculated by INPRS as though Husband had separated from service on October 4, 2016—the date of valuation—and would apply for an unreduced retirement benefit when he turned fifty-two in July 2018) would be $3254.86 and that the present value of Husband's 1977 Fund pension was $1,278,133.26. *See* Tr. Vol. II pp. 200, 223; Ex. 2A. Andrews, at Wife's request, then applied the coverture fraction formula (discussed below), concluding that Husband earned 61.52% of his pension during the marriage. Tr. Vol. II pp. 201-02; Ex. 2A (although Andrews testified that the coverture is 61.54%, his report provides that the coverture is 61.52%).[3] Both Husband and Wife asked the trial court to

---

[3] According to Exhibit 2A, Andrews calculated the length of marriage as 13.94 years, that is, from November 15, 1997 (date of marriage) to October 25, 2011 (date Wife filed for divorce). Andrews calculated the term of Husband's employment as 22.66 years, that is, from February 7, 1994 (date of hire) to October 4, 2016 (date Husband's pension was valued).

order the other party to pay their attorney's fees.  Tr. Vol. II p. 111; Tr. Vol. III p. 49.

[8]    On July 5, 2017, the trial court issued a decree of dissolution of marriage, which it amended in December following the parties' motions to correct error.  The amended decree addresses Husband's 1977 Fund pension as follows:

> 46. The Court finds that the period of time from the date of [Husband's] employment (February 7, 1994) until the Date of the Decree (July 5, 2017) to be a total period of 281 months. However, the parties were not married for the first 40 months of [Husband's] employment, and there was [a] 24-month period of time in 2002-3 in which [Husband] was not working and contributing to his pension.  Therefore, the pension vesting period was 217 months. (281 months – 64 months).  Thus, the percentage of the pension earned during the marriage is 77.2% (217 divided by 281).  [Wife] is entitled to half of that amount, or 38.6%.

> \* \* \* \* \*

> 48. [Wife] presented evidence in the form of a valuation report prepared by Dan Andrew[s] for [Husband's] 1977 Police and Firefighter pension.  (Exhibit 2A).  The Court accepts . . . Andrew[s'] valuation and places a value of $1,278,133.26 on said pension.  However, only 77.2% of that amount was earned during the marriage, or $986,718.83.

Appellant's App. Vol. II p. 24.  The court then divided the $986,718.83 equally, awarding Husband and Wife each $493,359.42.  *Id.* at 27 (Finding 59).  As to how Wife would receive her share of Husband's pension, the court explained:

62. Because the parties do not have sufficient assets to divide the value of [Husband's] pension, the Court elects to divide the monthly benefit instead.

63. [Husband's] pension benefit at age 52 is calculated to be $3,254.86 per month . . . .  [Husband] could apply for a reduced pension benefit January 1, 2017 in the amount of $2,894.22. (Exhibits 1, 2A, 2B, 2C).

64.  Upon his retirement, [Husband] shall forward 38.6% . . . of his monthly pension each month to [Wife], as a [QDRO] is not possible with the Firefighter Pension.  Because [Husband] . . . cannot determine his income tax liability before his earnings are calculated, [Husband] shall forward the pension amount directly to [Wife] and, each year, issue her a Form 1099 for her share of the pension.

65. The Court chooses this method of distributing [Husband's] pension due to the parties lacking sufficient resources to otherwise allocate sufficient assets and the inability of the pension to be divided by [QDRO].

*Id.* at 28.[4]

[9]   As for Wife's request for spousal maintenance, the court found:

---

[4] This method of distributing Husband's retirement benefits is referred to as the deferred-distribution method. Under this method, the court makes no immediate division of the retirement benefits but determines the future benefits to which the non-owning spouse is entitled. *Kendrick v. Kendrick*, 44 N.E.3d 721, 726 (Ind. Ct. App. 2015), *trans. denied*.  Traditionally, the benefits have been stated as a share of the owning spouse's future benefit, and payment can be ordered to come directly from the owning spouse. *Id.*  Under the other method, the immediate-offset method, the court determines the present value of the retirement benefits and awards the non-owning spouse his or her share of the benefits in an immediate lump-sum award of cash or property equal to the value of his or her interest.  *Id.*

74. The Court finds that [Wife] is disabled and in need of maintenance. [Wife] has been determined to be disabled by the Social Security Administration and receives Social Security Disability payments. [Wife] has been unable to work for several years.

* * * * *

82. The Court GRANTS [Wife's] request for spousal maintenance. The Court has reviewed I.C. 31-15-7-2 and the trial exhibits and agrees that [Wife] is in need of spousal maintenance. While [Wife] does currently receive disability income, it is not sufficient to sustain her needs. Pursuant to I.C. 31-15-7-2(3), the Court finds that [Husband] shall pay to [Wife] the sum of $1,000.00 or 16.2% of his monthly income as rehabilitative maintenance for a period of twenty-four (24) months.

*Id.* at 29-30. Finally, the trial court ordered Husband and Wife to pay their own attorney's fees:

86. Each party will receive sufficient funds from the sale of the marital residence out of which to pay his or her attorney fees. Accordingly, each party shall be responsible for his or her attorney fees and costs.

*Id.* at 30.

[10] Wife now appeals, and Husband cross-appeals.

# Discussion and Decision

## I. Husband's Firefighters' Pension

[11] It is well settled that in a dissolution action, all marital property, whether owned by either spouse before the marriage, acquired by either spouse after the marriage and before final separation of the parties, or acquired by their joint efforts, goes into the marital pot for division. Ind. Code § 31-15-7-4(a); *Falatovics v. Falatovics*, 15 N.E.3d 108, 110 (Ind. Ct. App. 2014). "Final separation" generally means the date that the petition for dissolution of marriage is filed. Ind. Code § 31-9-2-46. "Property" is defined in part as all the assets of either party or both parties, including:

> (1) a present right to withdraw pension or retirement benefits;
>
> (2) the right to receive pension or retirement benefits that are not forfeited upon termination of employment or that are vested (as defined in Section 411 of the Internal Revenue Code) but that are payable after the dissolution of marriage; and
>
> (3) the right to receive disposable retired or retainer pay (as defined in 10 U.S.C. 1408(a)) acquired during the marriage that is or may be payable after the dissolution of marriage.

Ind. Code § 31-9-2-98(b). "The requirement that all marital assets be placed in the marital pot is meant to insure that the trial court first determines that value before endeavoring to divide property." *Montgomery v. Faust,* 910 N.E.2d 234, 238 (Ind. Ct. App. 2009). "Indiana's 'one pot' theory prohibits the exclusion of any asset in which a party has a vested interest from the scope of the trial

court's power to divide and award." *Falatovics*, 15 N.E.3d at 110 (quotation omitted). While the trial court may decide to award a particular asset solely to one spouse as part of its just and reasonable property division, it must first include the asset in its consideration of the marital estate to be divided. *Id.*

[12] After determining what constitutes marital property, the trial court must then divide the marital property under the presumption that an equal division is just and reasonable. *Barton v. Barton*, 47 N.E.3d 368, 379 (Ind. Ct. App. 2015), *trans. denied*. This presumption may be rebutted by relevant evidence that an equal division would not be just and reasonable, such as the extent to which the property was acquired by each spouse before the marriage. Ind. Code § 31-15-7-5. However, the trial court must state its reasons for deviating from the presumption of an equal division in its findings and judgment. *Barton*, 47 N.E.3d at 379.

[13] We first note that Husband does not argue on appeal that his 1977 Fund pension is not "property" because it was not vested when Wife filed for divorce. *See In re Marriage of Adams*, 535 N.E.2d 124, 125-26 (Ind. 1989) (holding that a police pension that vested after the dissolution petition was filed but before the dissolution decree was entered was "property" according to Section 31-19-2-98(b)(2)[5] as a right to receive pension or retirement benefits not forfeited upon termination), *reh'g denied*; *see also Kirkman v. Kirkman*, 555 N.E.2d 1293, 1294

---

[5] At the time of *Adams*, this statute was located at Indiana Code section 31-1-11.5-11 (repealed in 1997).

(Ind. 1990) (applying *Adams* to situation where the husband's pension vested **after** the dissolution decree was entered and concluding: "In contrast to *Adams*, Danny Kirkman's right to pension benefits was neither vested nor had it become 'not forfeited upon termination' prior to the entry of the dissolution decree"); *but see Granzow v. Granzow*, 855 N.E.2d 680, 684 n.1 (Ind. Ct. App. 2006) (calling into doubt *Kirkman*'s use of "the date of dissolution as the point on which to identify marital property subject to division"). Accordingly, we start from the premise that Husband's 1977 Fund pension is marital property to be divided between the parties.

[14] Wife argues that the trial court erred "by utilizing a coverture fraction" to exclude a portion of Husband's 1977 Fund pension from the marital pot because it resulted in an unequal division of the marital property "without sufficient justification," contrary to Indiana law. Appellant's Br. pp. 8, 10. But it was Wife's own expert who applied the coverture fraction to Husband's pension (in both his report and at the hearing). *See* Tr. Vol. II p. 201 (Andrews testifying that Wife asked him to calculate the coverture). Wife has therefore invited any error concerning the trial court's application of the coverture fraction to Husband's pension. In any event, the trial court included Husband's "pension rights" "in the marital pot." Appellant's App. Vol. II p. 24 (Finding 47). The court explained, however, that it was setting aside a portion of the pension to Husband because it was earned before the parties' marriage; the court then equally divided the rest of the pension. *Id.* (Finding 46). This satisfies Indiana law.

[15]    Husband challenges the trial court's division of his 1977 Fund pension. Specifically, he argues that the trial court improperly calculated the percentage of his pension that was earned during the marriage as 77.2%. He claims that the percentage should be lower, because the court improperly included pension rights that he earned after Wife filed for divorce. Husband is correct.

[16]    The court calculated 77.2% using a coverture fraction. Specifically, the court found:

> 46. The Court finds that the period of time from the date of [Husband's] employment (February 7, 1994) **until the Date of the Decree (July 5, 2017)** to be a total period of 281 months. However, the parties were not married for the first 40 months of [Husband's] employment, and there was [a] 24-month period of time in 2002-3 in which [Husband] was not working and contributing to his pension. Therefore, the pension vesting period was 217 months. (281 months - 64 months). Thus, the percentage of the pension earned during the marriage is 77.2% (217 divided by 281). [Wife] is entitled to half of that amount, or 38.6%.

Appellant's App. Vol. II p. 24 (emphasis added). The court then ordered Husband to forward 38.6% "of his monthly pension each month" to Wife. *Id.* at 28 (Finding 64).

[17]    Determining the portion of a pension that was earned during a marriage "is one of the most difficult tasks in all of equitable distribution." 2 Brett R. Turner, Equitable Distribution of Property 3d, *Defined Benefit Plans: The Coverture Fraction* § 6.25 (Nov. 2017 update). Because neither the employer nor the

employee normally makes specific contributions to such a plan, the court cannot use a proration of funds. *Id.* Rather, the court can use a proration of time. *Id.* This proration is used to determine the coverture fraction, that is, the portion of the pension that was earned during the marriage.[6] *Id.* There are two formulas used to calculate the coverture fraction. The first one, which a "large majority" of courts use, is the date-of-retirement approach:

Date-of-retirement coverture fraction $=$ $\dfrac{\text{creditable time during marriage}}{\text{total creditable time}}$

*Id.*; *see also Morey v. Morey*, 49 N.E.3d 1065, 1071 (Ind. Ct. App. 2016) (explaining that the numerator is the period of time during which the marriage existed while pension rights were accruing and the denominator is the total period of time during which pension rights accrued). For example, if the employee is employed for 20 years, 12 of which occurred during the marriage, then 12/20 or 60% of the pension was earned during the marriage. Turner, *supra*, § 6.25. To compute the total marital interest in the pension, the fraction is multiplied by the employee's monthly benefit **at retirement**. *Id.*

[18] The second formula, which a "small but significant minority" of courts use, is the date-of-divorce approach:

Date-of-divorce coverture fraction $=$ $\dfrac{\text{creditable time during marriage}}{\text{total creditable time at divorce}}$

---

[6] According to Turner, "marital share fraction" is more accurate terminology than "coverture fraction." Turner, *supra*, § 6.25 at n.0.50.

*Id.* Although the numerators are the same in both formulas, this fraction uses total creditable time **at divorce** as the denominator, because the fraction is multiplied by what the monthly payment would be **at divorce**. *Id.* As Turner explains it, "[d]ifferent formulas are required because the denominator of the fraction must match **exactly** the period of time over which the employee acquired the benefit by which the fraction is being multiplied." *Id.* For example, an employee works 30 years: 5 years before the marriage, 15 years during the marriage, and 10 years after the marriage. According to the evidence presented, the employee's pension payment would have been $1000 per month had he retired at divorce. Thus, the coverture fraction is years married divided by years of employment at divorce, or 15/20 (75%). *Id.* To compute the total marital interest in the pension, the fraction is multiplied by what the monthly payment would be **at divorce** (not the actual pension payment, which presumably would be larger), 75% x $1000 per month= $750 per month. *Id.*

[19]  Here, the trial court did not use either formula. We therefore remand this case with instructions for the court to re-calculate the coverture fraction, acknowledging that Husband has since turned fifty-two and might be retired. To assist the trial court, we illustrate how each of the formulas would work in this case.

[20]  Using the date-of-divorce approach, the numerator of the coverture fraction is the creditable time during marriage, which is calculated from November 15, 1997, the date of marriage (since Husband was already accumulating pension

benefits when the parties got married),[7] to October 25, 2011, when Wife filed for divorce. *See Barton*, 47 N.E.3d at 380 & n.15 (calculating the numerator from the date of marriage to the date the dissolution petition was filed); Turner, *supra*, § 6.25 at n.28 (explaining that the ending date for the numerator is the "date of classification," which in Indiana is the date of "final separation"). This is a period of 167 months.[8]

[21]     The denominator is the total creditable time at divorce, which is calculated from February 7, 1994 (Husband's date of hire) to October 4, 2016 (date Husband's pension was valued).[9] This is a period of 271 months. 167/271 is 61.62%.[10] To compute the total marital interest in the pension, 61.62% is multiplied by Husband's estimated monthly benefit amount of $3254.86 (calculated by INPRS as though Husband had separated from service on October 4, 2016, and would apply for an unreduced retirement benefit when he

---

[7] The earliest starting date is the date of marriage. However, the date of marriage is not always the starting date because the employee could have started working after the date of marriage. In such a case, the date would be the date the employee started earning pension rights.

[8] Although Husband testified, and the trial court found, that Husband did not accrue pension rights for twenty-four months while he was "medically retired," INPRS and Andrews said he did. *See* Exs. 1 & 2C; *see also* Ind. Code § 36-8-8-12(e) ("Time spent receiving disability benefits, not to exceed twenty (20) years, is considered active service for the purpose of determining retirement benefits."); Tr. Vol. II p. 218 (Andrews testifying that "time off on disability in the 77 Plan counts as time served"). Therefore, the twenty-four months should be included.

[9] If Husband's pension could have been valued on the date Wife filed for divorce, that date presumably would have been used. However, Husband's pension was not vested when Wife filed for divorce and therefore had no value (other than Husband's member contributions). Neither party objected to using October 4, 2016.

[10] This is almost the same number that Andrews calculated—61.52%. *See* Tr. Vol. II p. 202; *see also* Ex. 2A.

turned fifty-two in July 2018), which is $2005.64. According to the trial court's finding, Wife would be entitled to 50% of this monthly payment, or $1002.82.

[22] The date-of-retirement approach can also be used. As with the date-of-divorce approach, the numerator is 167 months. However, the denominator, the total creditable time, cannot be determined until Husband retires. If, on remand, Husband has retired, the denominator would be from February 7, 1994 (Husband's date of hire), to Husband's date of retirement. To compute the total marital interest in the pension, the resulting fraction would be multiplied by Husband's actual monthly pension payment. If, however, Husband is still working, this formula can be used, but the denominator cannot be calculated until Husband retires. Likewise, the monthly benefit amount would be not known until Husband retires. If, on remand, Husband is still working, the trial court may place the formula in its order for the parties to calculate at Husband's retirement.

[23] Husband's next argument addresses taxes on Wife's portion of his pension. According to Indiana Code section 31-15-7-7, "The court, in determining what is just and reasonable in dividing property under this chapter, shall consider the tax consequences of the property disposition with respect to the present and future economic circumstances of each party." Here, the trial court ordered Husband, upon retirement, to forward a percentage of his monthly pension payment each month "directly to [Wife] and, each year, issue her a Form 1099 for her share of the pension." Appellant's App. Vol. II p. 28 (Finding 64); *see* Cross-Appellee's Br. p. 6 (stating that the trial court was likely referring to Form

1099-R). Husband contends that Form 1099-R is not the proper way to transfer the tax burden on Wife's portion of his pension to her. We agree.

[24] According to the IRS, Form 1099-R should be filed "for each person to whom you have made a designated distribution or are treated as having made a distribution of $10 or more from," among other things, retirement plans and pensions. IRS, *About Form 1099-R*, https://www.irs.gov/forms-pubs/about-form-1099-r. But Wife is not receiving a distribution from her pension; rather, Husband is receiving a distribution from his pension and then giving Wife a portion of it as part of the property settlement. Once Husband retires and starts receiving his pension, he will receive a Form 1099-R from INPRS for the full amount of his annual benefit and thus be responsible for taxes on the full amount. Accordingly, Form 1099-R is not a proper way to transfer Wife's tax burden to her.[11] On remand, the trial court can address the tax consequences by reducing Wife's percentage of Husband's monthly pension payment to account for the fact Husband is paying taxes on her portion. Or, if Husband has retired and his monthly pension payment is known, the trial court can determine the net, or after-tax, amount of Husband's monthly pension payment based on his

---

[11] As explained earlier, Husband's 1977 Fund pension is not subject to a QDRO. However, when a deferred-distribution award is implemented through a QDRO, the plan administrator gives a separate benefit check to each spouse, and each spouse is responsible for his or her own tax consequences. 2 Brett R. Turner, Equitable Distribution of Property 3d, *Defined Benefit Plans: Deferred Distribution Method* § 6.32 (Nov. 2017 update).

withholding[12] and then multiply the coverture fraction by Husband's net monthly pension payment.

## II. Maintenance Award

[25] Wife contends that the trial court erred in awarding her "rehabilitative" maintenance instead of "incapacity" maintenance. Spousal-maintenance awards in Indiana are "restricted to three, quite limited options": incapacity, caregiver, and rehabilitative. *In re Marriage of Gertiser*, 45 N.E.3d 363, 367 (Ind. 2015) (quotation omitted). Indiana Code section 31-15-7-2 sets forth the requirements of each:

> A court may make the following findings concerning maintenance:
>
> (1) If the court finds a spouse to be physically or mentally incapacitated to the extent that the ability of the incapacitated spouse to support himself or herself is materially affected, the court may find that maintenance for the spouse is necessary during the period of incapacity, subject to further order of the court.
>
> (2) If the court finds that:

---

[12] According to INPRS, it must "withhold federal taxes on monthly payments. You may choose not to have taxes withheld. Make sure to complete the tax withholding forms when you apply for benefits." INPRS, *[1977 Fund] Member Handbook*: *Taxation of Retirement Benefits*, https://www.in.gov/inprs/77fundmbrhandbooktaxationofrtmtbenefits.htm. If the trial court is worried that Husband will withhold too many taxes, thus decreasing the amount that Wife receives each month, the court can order Husband to withhold a specific amount.

(A) a spouse lacks sufficient property, including marital property apportioned to the spouse, to provide for the spouse's needs; and

(B) the spouse is the custodian of a child whose physical or mental incapacity requires the custodian to forgo employment;

the court may find that maintenance is necessary for the spouse in an amount and for a period of time that the court considers appropriate.

(3) After considering:

(A) the educational level of each spouse at the time of marriage and at the time the action is commenced;

(B) whether an interruption in the education, training, or employment of a spouse who is seeking maintenance occurred during the marriage as a result of homemaking or child care responsibilities, or both;

(C) the earning capacity of each spouse, including educational background, training, employment skills, work experience, and length of presence in or absence from the job market; and

(D) the time and expense necessary to acquire sufficient education or training to enable the spouse who is seeking maintenance to find appropriate employment;

a court may find that rehabilitative maintenance for the spouse seeking maintenance is necessary in an amount and for a period

of time that the court considers appropriate, but not to exceed three (3) years from the date of the final decree.

[26] In the absence of an agreement between the parties, the trial court's authority in ordering maintenance is limited to these three statutory options. *Cannon v. Cannon*, 758 N.E.2d 524, 526 (Ind. 2001) ("Where none of these circumstances exist, a court may not order maintenance without the agreement of the parties."). This is because the policy regarding spousal maintenance reflects a clear legislative intent to retain fairly strict limits on the power of courts to order maintenance without the consent of the parties. *Id.*

[27] In its findings, the trial court quoted only Section 31-15-7-2**(1)**, which addresses incapacity maintenance, but then found that Wife was "disabled" and entitled to "rehabilitative maintenance" under Section 31-15-7-2**(3)** for twenty-four months (unlike incapacity maintenance, which lasts for the duration of the incapacity until further order of the court, rehabilitative maintenance may not exceed three years from the date of the final decree).[13] However, the trial court's findings do not address the requirements for rehabilitative maintenance. And Wife concedes that "[t]here is no evidence of record which would support a finding of 'Rehabilitative Maintenance.'" Appellant's Br. p. 12. Further adding to the confusion is the fact that the trial court found that Husband "does

---

[13] Wife posits that the trial court awarded her rehabilitative maintenance for twenty-four months so that it ended "at approximately the time she will begin receiving her share of [Husband's] monthly pension benefit." Appellant's Br. p. 13.

not have the financial means to meet all the obligations this Court has now burdened him with **and** pay the spousal maintenance award." Appellant's App. Vol. II p. 30 (Finding 84) (emphasis added). Accordingly, we remand this case to the trial court with instructions to determine whether Wife is entitled to incapacity maintenance, taking into consideration Husband's ability to pay. *Barton*, 47 N.E.3d at 375-77. If the court awards Wife incapacity maintenance, it should last for the "period of incapacity, subject to further order of the court."

# III. Attorney's Fees

[28] Both Husband and Wife asked the trial court to order the other party to pay their attorney's fees, but the court ordered Husband and Wife to pay their own fees. The court reasoned that they will each "receive sufficient funds from the sale of the marital residence." Appellant's App. Vol. II p. 30 (Finding 86). Wife contends that the trial court erred in not ordering Husband to pay her attorney's fees. Pursuant to Indiana Code section 31-15-10-1, a trial court may order a party in a dissolution proceeding to pay a reasonable amount of the other party's attorney's fees. *Barton*, 47 N.E.3d at 377. The court has broad discretion in deciding whether to award attorney's fees. *Id.*

[29] In determining whether to award attorney's fees in a dissolution proceeding, trial courts should consider the parties' resources, their economic condition, their ability to engage in gainful employment and earn income, and other factors bearing on the reasonableness of the award. *Id.* A party's misconduct that directly results in additional litigation expenses may also be considered. *Id.*

Consideration of these factors promotes the legislative purpose behind the award of attorney's fees, which is to ensure that a party who would not otherwise be able to afford an attorney is able to retain representation. *Hartley v. Hartley*, 862 N.E.2d 274, 286-87 (Ind. Ct. App. 2007). When one party is in a superior position to pay fees over the other party, an award is proper. *Id.*

[30] Wife argues that the court should have ordered Husband to pay her attorney's fees of $22,000 due to her disability as well as Husband's superior earning capacity and conduct during the divorce proceedings, such as his failure to appear at some of the hearings and his failure to fully comply with discovery. The trial court made several findings regarding the parties' financial situation. That is, the court found that the parties were living "well above their means while married," that a "balloon payment" on the mortgage became due during the dissolution proceedings, and that "[Husband] and [Husband] alone has been responsible for the obligations relating to the marital residence during the almost 6-year pendency of this case." Appellant's App. Vol. II p. 30 (Findings 83 & 84). Although the trial court did not make any findings regarding Husband's conduct, the trial court was well aware that the divorce had been pending for nearly six years. The trial court did not abuse its discretion in ordering each party to pay their own attorney's fees. However, because this case is being remanded, the court can revisit the topic of attorney's fees if it chooses.

Affirmed in part and reversed and remanded in part.

Riley, J., and Kirsch, J., concur.