## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 27 2020, 8:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Christine C. Douglas
Keating Douglas LLP
Carmel, Indiana

ATTORNEY FOR APPELLEE

Melanie K. Reichert
Broyles Kight & Ricafort, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

T.J.W.,

*Appellant/Cross-Appellee-Petitioner,*

v.

K.M.W.,

*Appellee/Cross-Appellant-Respondent.*

February 27, 2020

Court of Appeals Case No.
19A-DC-2167

Appeal from the Marion Superior Court

The Honorable Gary L. Miller, Judge

The Honorable Deborah J. Shook, Magistrate

Trial Court Cause No.
49D03-1807-DC-29869

**Bailey, Judge.**

# Case Summary

This appeal stems from the dissolution of the marriage between T.W. ("Father") and K.W ("Mother"). After Father petitioned to dissolve the marriage, the parties resolved many issues through settlement agreements. They eventually presented several issues to the trial court. Father appeals—and Mother cross-appeals—from the trial court's order addressing (1) the distribution of personal property; (2) the educational and therapeutic plan for the parties' son ("Son"); and (3) the responsibility for attorney's fees.

We affirm.

# Issues

Father presents the following restated issue:

> 1. Whether an approved settlement agreement resolved all marital-property issues, precluding further consideration.

Mother presents the following restated issues:

> 2. Whether Father's educational and therapeutic plan was contrary to the terms of a settlement agreement.

> 3. Whether the court abused its discretion by declining to order Father to contribute toward Mother's attorney's fees.

# Facts and Procedural History

[5] Mother and Father married in 2011 and had two children during the marriage. Son was born in 2014 and later diagnosed with autism. Son received services and had an Individualized Education Program ("IEP") in place at a school in Winchester. At some point, Father moved from Winchester to Indianapolis. As of the final hearing in this matter, Mother was living in Winchester.

[6] In July 2018, Father petitioned to dissolve the marriage. The trial court held a provisional hearing in August 2018 and ordered the parties to participate in mediation before the final hearing. Father and Mother then participated in a mediation session, resulting in the first mediated settlement agreement. That agreement stated that it was settling Mother's and Father's "respective rights to and interests in property, real, personal and mixed, now owned by them, separately or jointly." Appellant's App. Vol. 2 at 15. Under the agreement, each party would have "one-half of the personal property and household goods and furniture to be divided by agreement of the parties." *Id.* at 16. The agreement also included the following dispute-resolution provision:

> If the parties are unable to agree on the division of personal property, the parties shall equally divide the cost for Bob Brown to appraise all property located on both sides of the marital residence duplex [in Indianapolis]; Wife's residence in Winchester, Indiana and in the storage unit. The parties shall then take turns picking items until each has 50% of the value as set forth on Bob Brown's appraisal.

*Id.* 16-17.  The agreement specified that "[p]ersonal property shall be removed and distributed 30 days from the approval of this Agreement."  *Id.* at 17.  The agreement also contained a clause contemplating the possibility of waiving or amending its terms: "No modification or waiver of any of the terms of this Agreement shall be valid, unless in writing and executed by both parties hereto."  *Id.* at 23.  The trial court approved the agreement in April 2019.

[7]  The parties participated in another mediation session, resulting in a second mediated settlement agreement.  That agreement provided for the appointment of Lara Pendoski ("Pendoski") as the Parenting Coordinator.  This agreement was approved by the trial court on May 20, 2019.  Thereafter, the court entered an order appointing Pendoski.  Pursuant to the order, Pendoski's role included "facilitating conflict management" as well as "assisting the parties in the development of parenting plans and alternative resolutions to other disputes."  Appellee's App. Vol. 2 at 3.  The order specified that Pendoski "shall attempt to resolve conflicts between the parties by recommendation, negotiation, education, and discussion" and that, if the parties cannot resolve disputes on their own or with Pendoski's suggestions, Pendoski could "make reports or recommendations to the parties and the court for further consideration."  *Id.*

[8]  On June 8, 2019, Father and Mother met at Father's residence to distribute personal property.  During the meeting, they signed a document that stated as follows: "Within next month still go through misc. items in both basements & 5602 upstairs.  [A friend] will come to see if they want outgrown children items.

Contested items will be discussed at mediation & possible negotiation of additional items if contested cannot be agreed upon." Exhibit Vol. I at 15.

[9] Father and Mother participated in a third mediation session, resulting in a third mediated settlement agreement. That agreement provided, in pertinent part, that Father would have primary physical custody of Son. The agreement specified that "[t]he parties shall share legal custody of both children with the parent having primary physical custody having the 'tie-breaking vote' in the event the parties cannot agree on a joint legal decision." Appellant's App. Vol. 2 at 37. The agreement also provided as follows: "[Father] shall have the final decision about [Son's] schooling and ABA services . . . . The parties agree that [Son] will receive ABA services; OT; Speech Therapy; special education/IEP as well as exposure to peer typical children until otherwise recommended by his providers or until no longer covered by insurance or Medicaid." *Id.* at 38.

[10] During the third mediation session, the parties did not resolve any marital-property issues. Their third agreement stated that there was "a dispute as to whether personal property has been distributed and finalized pursuant to the First Partial Agreement which shall . . . be reserved for final hearing." *Id.* at 40. It also stated that "[t]he issue [of] attorney fees . . . shall be reserved for final hearing set for August 19, 2019." *Id.* The court approved the agreement in July 2019, and issued a decree dissolving the marriage between Father and Mother. In issuing the decree, the court expressly incorporated the parties' agreements.

[11]     Before the final hearing, a dispute arose over the educational and therapeutic plan for Son. In July 2019, Father obtained an assessment from a provider of ABA services. The assessment recommended that Son receive forty hours per week of ABA therapy. Father planned to have son participate in the therapy. Father was also exploring a preschool-like program to provide exposure to peer-typical children. Mother asserted that Father's plan violated the third settlement agreement because the ABA services would not be administered at a school with opportunities for concurrent exposure to peer-typical children. Father and Mother brought the dispute to Pendoski, who prepared and filed a report. Therein, Pendoski recommended following Father's plan for Son.

[12]     On August 19, 2019, a final hearing was held. The parties agreed to addressing two issues at the final hearing—*i.e.*, they agreed that the court should address (1) the plan for Son and (2) attorney's fees incurred during the proceedings, as each party sought contribution from the other party. Mother also asked the court to address contested marital property. Father objected, claiming that all property issues had been resolved through the first settlement agreement. He asserted that Mother waived any challenge to the division of property by failing to follow the dispute-resolution procedures set forth in the first agreement.

[13]     The court heard evidence and addressed all three issues in a written order. As for personal property, the court determined that "[d]espite having 'resolved' the personal property issues, the distribution of that personal property has not been completed." Appellant's App. Vol. II at 47. In its written order, the court ordered Mother to provide Father with a "specific list of property she claims she

has not received." *Id.* The court also addressed gifts and heirlooms, ordering that the parties were entitled to gifts and heirlooms from their respective families. *Id.* As for the educational and therapeutic plan, the court adopted Pendoski's recommendation, determining that Father's plan was not contrary to the agreement. Finally, the court denied the parties' requests for attorney's fees, noting that (1) the parties had incurred "about the same total amount" of fees; (2) "[e]ach party had kept up with his/her fees throughout the cause"; and (3) [b]oth parties['] income, assets and access to income has been considered and each has sufficient income/assets to pay for his/her own fees." *Id.*

[14] Father now appeals. Mother cross-appeals.

# Discussion and Decision

[15] Where—as here—the trial court entered *sua sponte* findings and conclusions, those findings and conclusions control the issues they cover, with a general-judgment standard controlling "other issues . . . not covered by such findings." Ind. Trial Rule 52(D). We look to whether the evidence supports the findings and the findings support the judgment. *Masters v. Masters*, 43 N.E.3d 570, 575 (Ind. 2015). Pursuant to Trial Rule 52(A), we "shall not set aside the findings or judgment unless clearly erroneous" and shall give "due regard . . . to the opportunity of the trial court to judge the credibility of the witnesses." Clear error is "that which leaves us with a definite and firm conviction that a mistake has been made." *Masters*, 43 N.E.3d at 575 (quoting *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Furthermore, findings are

clearly erroneous if "the record contains no facts supporting them either directly or inferentially."  *Town of Brownsburg v. Fight Against Brownsburg Annexation*, 124 N.E.3d 597, 601 (Ind. 2019).  Moreover, the "judgment . . . must follow from the conclusions of law and is clearly erroneous if the court applied the 'wrong legal standard to properly found facts.'"  *Id.* (quoting *Town of Fortville v. Certain Fortville Annexation Territory Landowners*, 51 N.E.3d 1195, 1198 (Ind. 2016)).

## Contract Issues

[16]     The parties to a dissolution action "may agree in writing" to contract terms concerning "the disposition of any property" and "the custody and support of the children of the parties."  Ind. Code § 31-15-2-17(a).  If approved by the court, those settlement terms "shall be incorporated and merged into the decree and the parties shall be ordered to perform the terms."  I.C. § 31-15-2-17(b).  At that point, "[t]he disposition of property settled by [the] agreement . . . is not subject to subsequent modification by the court, except as the agreement prescribes or the parties subsequently consent."  I.C. § 31-15-2-17(c).

[17]     In general, the meaning of a written contract "is a pure question of law for the court," subject to *de novo* review.  *Harrison v. Thomas*, 761 N.E.2d 816, 818 (Ind. 2002).  Moreover, a marriage-settlement agreement is construed like any other contract.  *See Ryan v. Ryan*, 972 N.E.2d 359, 364 (Ind. 2012).  "[U]nless the terms of the contract are ambiguous, they will be given their plain and ordinary meaning.  Clear and unambiguous terms in the contract are deemed conclusive,

and when they are present we . . . will merely apply the contractual provisions."
*Id.* (quoting *Shorter v. Shorter*, 851 N.E.2d 378, 383 (Ind. Ct. App. 2006)).

## Property

[18] The first approved settlement agreement specified that it was settling matters concerning personal property. That agreement contained a mechanism for modifying the agreement—through a writing signed by Mother and Father. After entering into the first agreement, the parties executed a document that brought personal-property matters back into issue. Indeed, the document specified that the parties would go through personal property and "[c]ontested items will be discussed at mediation" with "possible negotiation of additional items if contested cannot be agreed upon." Exhibit Vol. at 15. The parties did not resolve personal-property issues at the next mediation session, with their third agreement identifying "a dispute as to whether personal property has been distributed and finalized pursuant to the First Partial Agreement which shall . . . be reserved for final hearing." Appellant's App. Vol. 2 at 40.

[19] Father argues that he and Mother fully resolved property issues in the first settlement agreement—and that the trial court therefore erred by addressing personal-property issues at the final hearing. He argues that Mother should have followed the dispute-resolution procedures in the first agreement.

[20] In one sense, Father is correct; Father and Mother attempted to divide personal property in the first agreement. However, the parties subsequently consented to modifying the agreement as to personal property—contemplating bringing

unresolved personal-property issues to mediation. Following that modification, those issues were not resolved prior to the final hearing. Therefore, we cannot say the trial court erred by addressing these unresolved personal-property issues.

## Educational and Therapeutic Plan

[21] Pursuant to the third approved agreement, Father had primary physical custody of Son. The parties had joint legal custody, meaning they would "share authority and responsibility for the major decisions concerning the child's upbringing, including the child's education, health care, and religious training." I.C. § 31-9-2-67. Nevertheless, Father had tie-breaking authority if there was a disagreement as to Son's upbringing. Moreover, the agreement specified that Son "**will receive** ABA services; OT; Speech Therapy; special education/IEP as well as exposure to peer typical children until otherwise recommended by his providers or until no longer covered by insurance or Medicaid." Appellant's App. Vol. 2 at 38. (emphasis added). The agreement also authorized Father to make "the final decision" regarding Son's schooling and ABA services. *Id.*

[22] Before the hearing, Father obtained an assessment from a provider of ABA services—Bierman Autism Center. That provider recommended that Son participate in forty hours of ABA services each week. Father planned to follow the recommendation, which led to a dispute. According to Mother, the agreement required a "combination of services/opportunities." Appellee's App. Vol. 2 at 15. It appears that Mother wanted Son to have services more in line with what he received at his former school in Winchester. Under the IEP

at that school, Son would receive approximately twenty-seven hours per week of ABA therapy and "they would allow the ABA therapist to come to school," where the therapist "would be present to help [Son] attune to the preschool teacher." Tr. Vol. 2 at 83. With integrated ABA services, Son would have exposure to peer-typical children and would also receive special education.

[23] Mother focuses on the provision specifying that Son "will receive" certain services. Appellant's App. Vol. 2 at 38. She argued at trial—and reasserts on appeal—that, because the forty hours of ABA services would not include concurrent exposure to peer-typical children, Father's plan was contrary to the agreement. Mother also asserts that providing forty hours of ABA services would "eliminat[e] classroom time for special education." Appellee's App. Vol. 2 at 22. She contends that Pendoski should not have recommended Father's plan, and the trial court should not have adopted Pendoski's recommendation.

[24] The trial court ultimately concluded that "the agreement at issue does not require contemporaneous exposure to peer typical children and in [Son's] educational curriculum only." *Id.* at 48. We agree. Although the agreement specified that Son "will receive" several types of services, the agreement did not specify how much time was to be allocated to each service or whether those services were to be rendered concurrently—or in a particular order. Moreover, the agreement gave Father final decision-making authority regarding ABA services. There was evidence that Father selected an ABA service provider and planned to follow its recommendations for Son. He was also exploring alternative ways to provide exposure to peer-typical children. Furthermore,

Father had "indicated that if [the provider of ABA services] were to recommend school and . . . special education services, . . . that's what he would follow, that recommendation." Tr. at 20. There was evidence that, if the provider did not recommend school and special education, the goal of the ABA services would be to "prepare [Son] for that situation." *Id.* Moreover, Father anticipated that Son "would have an IEP and special education services in the future." *Id.*

[25] We conclude that the plan was consistent with the provisions merged into the dissolution decree. Thus, we cannot say the court erred in allowing the plan.[1]

## Attorney's Fees

[26] A court may order a party to pay "a reasonable amount . . . to the other party" for attorney's fees associated with a dissolution action. I.C. § 31-15-10-1(a). The court has broad discretion in deciding whether to award attorney's fees, and we will reverse its decision only upon a showing of an abuse of discretion. *See Whited v. Whited*, 859 N.E.2d 657, 665 (Ind. 2007). An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and

---

[1] Moreover, assuming *arguendo* the order was tantamount to a modification of the legal-custody arrangement, the court has authority to modify its custody order where doing so "is in the best interests of the child" and "there is a substantial change in one (1) or more of the factors" listed in Indiana Code Section 31-17-2-8. I.C. § 31-17-2-21. Among those factors is "[t]he mental and physical health of all individuals involved." I.C. § 31-17-2-8. Here, there is evidence that Son would benefit from forty hours per week of ABA services with the goal of preparing Son for integration into a school setting with an IEP in place. To the extent Mother points out that a prior assessment recommended only twenty-seven hours of ABA services and Son already had an IEP, the court was free to give more weight to Father's recent assessment. Ultimately, the evidence supports a determination that it is in Son's best interests to receive increased ABA services now—which would preclude a more-integrated therapeutic approach—and strive for that integrated approach in the future.

circumstances. *DePuy Orthopaedics, Inc. v. Brown*, 29 N.E.3d 729, 731-32 (Ind. 2015). An abuse of discretion also occurs if the court misapplies the law. *Id.*

[27] "In determining whether to award attorney's fees in a dissolution proceeding, trial courts should consider the parties' resources, their economic condition, their ability to engage in gainful employment and earn income, and other factors bearing on the reasonableness of the award." *Eads v. Eads*, 114 N.E.3d 868, 879 (Ind. Ct. App. 2018). Moreover, "[a] party's misconduct that directly results in additional litigation expenses may also be considered." *Id.*

[28] Here, there is evidence that Mother incurred about $44,000 in attorney's fees and that Father incurred a similar amount—about $46,000. As to income, Father earns a salary of about $109,000 per year and was eligible for an annual bonus. Mother has an M.B.A. and worked full-time for the first three months of the marriage, earning around $55,000 per year as the executive director of an organization. She then transitioned to part-time work and took care of the children. After Father filed the dissolution petition, Mother began working about twenty hours per week as a paraprofessional at an elementary school. As a paraprofessional, she earns $11.25 per hour. There is also evidence that, to pay attorney's fees, Mother borrowed $15,000 from individuals and incurred substantial credit-card debt. As of the final hearing, Mother leased a home her parents owned. Her parents were allowing her additional time to pay rent.

[29] The trial court denied Mother's request for a fee contribution from Father. In doing so, the court observed that Mother had kept up with her fees during the

course of the proceedings. The court also noted that it had considered Mother's "income, assets and access to income" and that Mother "has sufficient income/assets to pay for . . . her own fees." Appellant's App. Vol. 2 at 47.

[30] Mother argues that denying her request for attorney's fees was an abuse of discretion, contending that the court did not "fully [or] accurately assess the parties' financial situations." Reply Br. of Cross-Appellant at 4. Mother focuses on the difference between incomes. She also argues that Father is in a better financial position due to the division of assets—that is, when the parties divided assets, Father received real estate, "which can be accessed without tax consequence through an equity line of credit," whereas "the majority of the marital assets received by Mother were in the form of retirement funds," the liquidation of which results in "tax consequences." Br. of Appellee at 21.

[31] Mother also directs us to *Barton v. Barton*, a case involving income disparity. 47 N.E.3d 368 (Ind. Ct. App. 2015), *trans. denied*. However, there—unlike here—the trial court elected to award attorney's fees. *See id.* Indeed, in resolving *Barton*, this Court identified evidence of income disparity and concluded there was no abuse of discretion in ordering the higher-earning party to pay a portion of the other party's attorney's fees. *See id.* In other words, the award was not clearly against the logic and effect of the facts and circumstances in that case. *See id.* To the extent Mother is arguing as much, *Barton* does not support the proposition that a court must award fees upon a showing of income disparity.

[32] Ultimately, regardless of tax consequences, Mother negotiated a settlement agreement and left the marriage with assets—among them, $121,500 of a 401(k) plan. Moreover, there is evidence that Mother has an advanced degree and is employable—capable of obtaining a substantially higher-paying, full-time job. Mother notes that "[t]he parties agreed that Mother would work primarily within the home during the marriage, especially in light of the fact that their younger child has special needs." Br. of Appellee at 20. However, as of the final hearing, Father had primary physical custody of Son. Their daughter—of which Mother is the primary physical custodian—attends school, and there is no indication that she requires special services in the way that Son does.

[33] It was not clearly against the logic and effect of the facts and circumstances to decline Mother's request to have Father contribute toward her attorney's fees.

[34] Affirmed.


Kirsch, J., concurs.
Mathias, J., dissents with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

T.J.W.,

*Appellant/Cross-Appellee-Petitioner,*

v.

K.M.W.,

*Appellee/Cross-Appellant-Respondent.*

Court of Appeals Case No.
19A-DC-2167

**Mathias, Judge, dissenting.**

[35] Although I concur with much of the majority's reasoning and result, I respectfully dissent as to the trial court's decision not to award Mother any attorney's fees at all.

[36] As the majority points out in its opinion:

> "In determining whether to award attorney's fees in a dissolution proceeding, trial courts should consider the parties' resources, their economic condition, their ability to engage in gainful employment and earn income, and other factors bearing on the reasonableness of the award." *Eads v. Eads*, 114 N.E.3d 868, 879 (Ind. Ct. App. 2018). Moreover, "[a] party's misconduct that directly results in additional litigation expenses may also be considered." *Id.*

Here, there is evidence that Mother incurred about $44,000 in attorney's fees and that Father incurred a similar amount—about $46,000. As to income, Father earns a salary of about $109,000 per year and was eligible for an annual bonus. Mother has an M.B.A. and worked full-time for the first three months of the marriage, earning around $55,000 per year as the executive director of an organization. She then transitioned to part-time work and took care of the children. After Father filed the dissolution petition, Mother began working about twenty hours per week as a paraprofessional at an elementary school. As a paraprofessional, she earns $11.25 per hour. There is also evidence that, to pay attorney's fees, Mother borrowed $15,000 from individuals and incurred substantial credit-card debt. As of the final hearing, Mother leased a home her parents owned. Her parents were allowing her additional time to pay rent.

The trial court denied Mother's request for a fee contribution from Father. In doing so, the court observed that Mother had kept up with her fees during the course of the proceedings. The court also noted that it had considered Mother's "income, assets and access to income" and that Mother "has sufficient income/assets to pay for . . . her own fees." Appellant's App. Vol. 2 at 47.

Slip op. at 13.

[37]    The review standard in the area of the award of attorney fees is abuse of discretion. *Eads*, 114 N.E.3d at 879. The question of an attorney fee award is separate from the division of property. *See id.* (listing the factors the trial court may consider in deciding whether to award attorney fees); *Bloodgood v. Bloodgood*, 679 N.E.2d 953, 958 (Ind. Ct. App. 1997) (affirming an award of

attorney fees to Wife due to disparity in the parties' incomes where the court equally divided the marital estate).

[38] My review of the evidence cited by the majority leads me to the opposite conclusion both it and the trial court reached. Mother's economic condition is quite poor, and there is no credible way to conclude that she will ever be able to find a position like the executive directorship she left in order to care for the parties' children. Further, there is no credible way to impute that level of income to Mother. All of the available evidence supports an award of attorney's fees to Mother in the full amount of her documented fees incurred. The failure to award Mother any fees at all is a clear abuse of the trial court's discretion and should be reversed.