

FILED

Dec 20 2024, 10:21 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

Evan Schwarz,

*Appellant-Petitioner*

v.

Michelle Schwarz,

*Appellee-Respondent*

---

December 20, 2024

Court of Appeals Case No.
24A-DC-916

Appeal from the Allen Superior Court

The Honorable Lori K. Morgan, Judge
The Honorable Sherry Hartzler, Magistrate

Trial Court Cause No.
02D08-2207-DC-865

---

**Opinion by Judge Pyle**

Judges Weissmann and Felix concur.

**Pyle, Judge.**

## Statement of the Case

Evan Schwarz ("Father") appeals the trial court's order dissolving his marriage to Michelle Schwarz ("Mother") (collectively "Parents"). Father argues that: (1) the trial court abused its discretion when it awarded Mother primary physical custody and sole legal custody of the parties' four children ("the children"); (2) the trial court abused its discretion when it divided the marital estate; and (3) the trial court failed to award Father a credit, as set forth in Parents' December 2022 interim agreement ("the December 2022 interim agreement"), for the hotel expenses that he had prepaid for Mother.

Concluding that the trial court did not abuse its discretion when it awarded Mother primary physical custody and sole legal custody of the children and when it divided the marital estate, we affirm those portions of the trial court's order. However, further concluding that the trial court failed to award Father a credit, as set forth in the December 2022 interim agreement, for the hotel expenses that he had prepaid for Mother, we remand with instructions for the trial court to award Father that $3,256.26 credit.

We affirm in part and remand with instructions.

## Issues

1. Whether the trial court abused its discretion when it awarded Mother primary physical custody and sole legal custody of the children.

2. Whether the trial court abused its discretion when it divided the marital estate.

3. Whether the trial court failed to award Father a credit, as set forth in the December 2022 interim agreement, for the hotel expenses that he had prepaid for Mother.

## Facts

Mother and Father, who both grew up in Wisconsin, met while they were in college. Mother attended University of Wisconsin at Oshkosh and obtained a degree in education. Father attended University of Wisconsin at Madison and obtained a business degree. Father subsequently obtained an M.B.A. at the University of Chicago.

In 2012, Mother and Father moved to Illinois because of Father's job, and Mother obtained a teaching position. Mother and Father married in 2014, and their daughter, M.S. ("M.S."), was born in May 2015. Following M.S.'s birth, Mother suffered from severe post-partum depression and frequently returned to her parents' ("maternal grandparents") 240-acre family farm in Berlin, Wisconsin, for support and help with M.S. During that time, Father, who was working long hours and building his career, remained in Illinois. In addition, Father, who had previously told Mother that he operated "under the philosophy that life should be work hard play hard[,]" spent weekends

participating in golf outings and traveling across the country with friends to University of Wisconsin football games. (Tr. Vol. 2 at 32).

[6] Mother eventually returned to her home and job in Illinois and subsequently became pregnant with Parents' second child. Following an ultrasound, a physician told Mother that it appeared that her unborn child had cysts in his brain and might be born dead. A physician scheduled Mother for a level 2 ultrasound to further investigate her unborn child's health issues. Shortly before the scheduled ultrasound, Father left on a personal trip to California with friends from Germany, and Mother's mother ("maternal grandmother") travelled from Wisconsin to Illinois to attend the ultrasound with Mother. During the ultrasound, Mother learned that her unborn child was healthy. Parents' son, G.S. ("G.S.") was born in February 2017. Following G.S.'s birth, Mother frequently went to the family farm in Berlin for support and help with M.S. and G.S.

[7] Mother subsequently returned to her home and to her teaching position in Illinois. Father continued to work long hours and participate in activities with friends on the weekends. In August 2018, Mother gave birth to twin boys, W.S. ("W.S.") and M.B.S. ("M.B.S."). Maternal grandmother took family leave from her teaching position in Wisconsin and stayed in Illinois for three months to help Mother with the children. Thereafter, with four children under the age of four, Mother quit her teaching position and became a stay-at-home mom.

[8] Mother expected that Father's "work hard play hard" philosophy would change with four young children in the home and that Father would spend more time with the family and help with the children. (Tr. Vol. 2 at 32). However, Father continued to work long hours, frequently coming home late and eating dinner in his home office. In addition, Father showed little interest in the children. When Father agreed one night to help Mother feed the twins, Father became frustrated when one of the infants would not take the bottle. Father called the infant an asshole and threw the bottle. At that point, Mother decided that it was not worth the repercussions to ask Father to help her with the children. Father also became obsessed with having a clean house and frequently called Mother an "undisciplined lazy[,] lazy piece of shit for not cleaning up things[.]" (Tr. Vol. 2 at 37). Father was also irritated because Mother "put in enriching the kids in front of the housework so the house m[ight] be messy from Play-Doh or there[] [were] crayons on the floor . . . and this would even put him . . . into fits of rage[.]" (Tr. Vol. 2 at 37).

[9] Exhausted from taking care of four young children, Mother began spending weeks at a time in Berlin. Maternal grandparents helped her with the children. For example, when the twins were infants, Mother's father ("maternal grandfather") took care of them from midnight until 4:00 a.m. so that Mother had the opportunity to sleep. From 2018 until 2021, Mother and the children spent more than fifty percent of their time in Berlin.

[10] In 2021, Father accepted a controller position at Reelcraft, which is a subsidiary of Madison Industries. Reelcraft is located in Columbia, Indiana, and the

family planned to move to Fort Wayne. Father moved to Fort Wayne to find a house for the family, and Mother and the children returned to Berlin, where Parents enrolled M.S. in school. While the children were living in Berlin, Father made several trips to Wisconsin to visit family and friends. However, even when in Wisconsin, Father rarely made the trip to Berlin to visit the children. Further, the children rarely asked about Father because they were "kind of used to him not being there." (Tr. Vol. 2 at 60).

[11] After Father had purchased a home in Indiana, Mother and the children arrived in Fort Wayne in July 2021. In December 2021, Parents decided to spend the holidays in Wisconsin and to split their time between paternal grandparents' home and maternal grandparents' home. Father spent Christmas day at a football game while Mother and the children visited with maternal grandparents. A few days later, Parents and maternal grandparents took the children bowling. Father, who did not "do really great in chaotic situations[,] noises with the kids[,] things of that nature[,] . . . was on edge . . . he had been yelling at the kids on and off throughout the experience[.]" (Tr. Vol. 2 at 112). When three-year-old W.S. disobeyed Father, Father "grabbed [W.S.] by the arm and whipped him in the chair a few feet away just like he was a little ragdoll[.]" (Tr. Vol. 2 at 112). Maternal grandfather believed that Father's actions constituted "the most outrageous parenting act [maternal grandfather] ha[d] ever seen in [his] life[.]" (Tr. Vol. 3 at 20). W.S. sat in maternal grandmother's lap for the rest of the night.

[12]     Two days later, Parents and the children went to paternal grandparents' home, where Parents and the children slept in the same bedroom. After arguing throughout the day, while Mother was attempting to put the children to bed, Mother and Father became involved in a physical altercation. According to Mother, Father put his hand in her face. When Mother moved Father's hand away from her face, Father tackled her and shoved her face to the floor. Mother broke free and locked herself in the bathroom, and Father broke the door and told Mother to either sit down and talk to him or he would call the police. When Mother refused to talk to Father, he called the police. The officers determined that Mother had "thr[own] the first punch" when she hit his hand out of her face and arrested her. (Tr. Vol. 2 at 114). After the charge had been dropped, Mother decided that "enough is enough[.]" (Tr. Vol. 2 at 114).

[13]     In January 2022, Mother filed a dissolution petition. The trial court subsequently entered a provisional order awarding Mother primary physical custody of the children and ordering Parents to share joint legal custody of the children. In May 2022, Mother filed a notice of intent to relocate with the children to Berlin, Wisconsin. One week later, Mother filed a motion to dismiss the dissolution petition, which the trial court granted. Two months later, in July 2022, Mother and the children went to Berlin to visit maternal grandparents.

[14]     On July 25, 2022, Mother filed a second dissolution petition, wherein she alleged that she had moved to Berlin on July 4, 2022. According to Mother, the children were residing with her in Berlin. Two days later, Father filed a

dissolution cross-petition. Father also filed a motion for a temporary restraining order to prevent Mother from relocating to Berlin and enrolling the children in school there. In this motion, Father stated that he had believed that Mother and the children had simply been visiting family in Berlin during July. According to Father, Mother and the children had been scheduled to return to the family's Indiana residence on July 30, 2022. However, Mother "ha[d] expressed her intent through counsel that she ha[d] relocated to Wisconsin and plan[ned] to enroll the minor children of the marriage in the Berlin, Wisconsin school district." (App. Vol. 2 at 34). Father asked the trial court to prohibit Mother from relocating the children to Berlin and to order Mother to return the children to their Indiana residence. Father also filed motions requesting that the trial court order a psychological custodial evaluation and appoint a guardian ad litem. In addition, Father filed a motion requesting a provisional order.

[15] In September 2022, Parents stipulated to the custodial evaluation and agreed that Dr. Jenny Seiss ("Dr. Seiss") would perform it. Parents further stipulated to the appointment of Lierin Rossman ("GAL Rossman") as the guardian ad litem.

[16] Also, in September 2022, the trial court held a hearing on Father's motion requesting a provisional order. At the hearing, Father testified that after Mother had dismissed her January 2022 dissolution petition, Father had believed that he and Mother were reconciling. Father further testified that Mother had not discussed with him her intent to relocate the children to Berlin.

Father also testified that the family had lived in Illinois for ten years before moving to Indiana and had agreed that they would relocate as Father's job required. Father also testified that he was the sole financial provider for the family and that he did not believe that he could find similar employment in or around Berlin. In addition, Father testified that he and maternal grandparents did not get along well. Father further testified that maternal grandparents interfered with his attempts to communicate with the children and attempted to alienate the children from him.

[17] Following the hearing, in November 2022, the trial court issued an order ("the November 2022 provisional order") requiring Mother to return to Fort Wayne and to immediately re-enroll the two older children in the Fort Wayne schools that they had previously attended. The trial court's order specifically provided that if Mother returned to and remained in Fort Wayne, Mother would be awarded primary physical custody of the children. However, if Mother remained in Berlin, the trial court's order provided that Father would be awarded primary physical custody of the children. The trial court further awarded Parents joint legal custody of the children.

[18] Mother and the children returned to Fort Wayne in December 2022. That same month, Mother filed a notice of intent to relocate the children to Berlin. The reason for the relocation was the support of maternal grandparents. Father filed an objection to the relocation.

[19]     Also, in December 2022, Parents entered into the December 2022 interim agreement. All provisions of the November 2022 provisional order were incorporated into the December 2022 interim order. In addition, the December 2022 interim order provided as follows:

> 2.4    [Father] shall prepay the costs for a hotel for [Mother] to stay overnight commencing December 30, 2022 and until he vacates the marital residence, the costs incurred by [Father] which shall be credited against any child support arrearage and/or property equalization payment owed at the finalization of this cause.

(App. Vol. 2 at 58).

[20]     Parents and the children remained in Fort Wayne during the pendency of the dissolution proceedings. In February 2023, Parents and the children attended a science fair that M.S. was participating in at school. While viewing the exhibits at the science fair, Father became upset with Mother and called her "a cunt[,] call[ed] [her] a piece of shit[,] an[] appalling piece of shit . . . a piece of trash[,] the piece of garbage[,] a whore[,] all these things in the gymnasium of [M.S.]'s school." (Tr. Vol. 2 at 74). Mother audio-recorded Father's tirade.

[21]     The trial court held a five-day dissolution hearing in September and October 2023 and in January 2024. At the hearing, the trial court heard the facts as set forth above. In addition, Mother testified and re-iterated that Father "doesn't do well in any disorder or noise anything that is not kind of in its place or out of place . . . bothers him . . . so the normal kid being kid moments and kids being noisy and kids being loud and making messes upset him quite a bit and that

anger can come out quite a bit." (Tr. Vol. 2 at 67). Further, according to Mother, she and Father disagreed on educational, medical, and religious decisions concerning the children.

[22] When asked why she wanted to relocate the children to Berlin, Mother explained that she would have financial stability because she and the children would be able to live in one of the three houses located on the Berlin farm. In addition, Mother would have the opportunity to return to teaching because maternal grandfather had retired and would be available to take care of the children if any of them became sick. Mother testified that she thought she would make about $50,000 per year if she obtained a teaching position. Mother further testified that the children would have stability in Berlin.

[23] Dr. Seiss, who completed a thirty-page written custody evaluation, also testified at the hearing. According to Dr. Seiss, in preparing the custody evaluation, she had conducted psychological testing of Parents, completed a family observation of each parent with the children, met with each child individually, and done a follow-up interview with each parent. Dr. Seiss testified that the results of Mother's psychological testing did not indicate a psychological dysfunction. However, according to Dr. Seiss, the results of Father's psychological testing revealed that Father tended to be self-centered and had low coping skills. Dr. Seiss recommended that Father attend individual counseling with treatment goals including the development of realistic expectations of others, perspective-taking, and coping skills.

[24] Dr. Seiss further testified that the children were bonded with each other and with Mother. In addition, although the children interacted well with Father during Dr. Seiss' family observations, when Dr. Seiss asked each child to draw a family picture, the three youngest children did not include Father in their drawings, even when prompted to do so. G.S. told Dr. Seiss that he had not included Father in his drawing because Father was mean to him and G.S. did not like that. The other children "similarly expressed and described that [Father] can yell and it's scary[.]" (Tr. Vol. 2 at 215). Dr. Seiss also testified that when she had asked M.S. her wish, M.S. had responded that "her wish was to return to her grandparent[s'] home and . . . she became very very upset . . . almost like a guttural sob and then . . . came in for a hug[.]" (Tr. Vol. 2 at 215).

[25] In her written evaluation, Dr. Seiss noted her concern that if Father did not change his parenting style, his relationship with the children as they matured could become seriously ruptured. She recommended that Father attend a relationship-based parenting education class and/or work with an individual parenting coach.

[26] Dr. Seiss further testified that Mother had been the children's primary caregiver and that the children perceived maternal grandparents to be a part of their immediate family. Dr. Seiss also testified that the children had spent a large percentage of their lives in Berlin and perceived it as their home. Dr. Seiss recommended that the trial court award Mother primary physical custody of the children and authorize Mother to relocate the children to Berlin. In addition, based upon her concern about the dynamics between Parents, Dr. Seiss

recommended "joint legal [custody] but . . . legal lite with [Mother] having final decision-making authority." (Tr. Vol. 2 at 217-18).

[27] Father also testified at the hearing. According to Father, he had recently taken a senior director of finance position at Atlanta-based Porex, which was a subsidiary of Madison Industries. Porex has six sites across the world with a finance leader at each site. Father directly oversees one of these finance leaders and indirectly oversees the other five finance leaders. Father's annual salary is $198,600. Father further testified that although this is a remote position, he is required to spend fifteen to twenty percent of his time in Atlanta. The position also requires Father to travel to Richmond, Virginia, as well as Europe and Asia. Thus, according to Father, he needs to live within thirty minutes of an airport. Father testified that he planned to relocate to Milwaukee because it was not feasible for him to live in Berlin. Father wanted the children to live in the Milwaukee area.

[28] Father further testified about the physical altercation with Mother that had occurred at paternal grandparents' home in December 2021. According to Father, Mother, who had been drinking wine all day, had made a snarky comment to him. Father further testified that when he had admonished Mother for starting an argument in front of the children, Mother had punched him in the face, giving him a concussion. Father acknowledged that he had taken Mother to the floor and held her down. He also acknowledged that he had opened the bathroom door and called the police.

[29] In addition, Father testified that he "wasn't asking for some crazy standard of cleanliness[.]" (Tr. Vol. 3 at 116). Rather, according to Father, because "banana peels and hot dogs and things like that would get thrown behind couches[,]" he had been concerned about ants invading the house. (Tr. Vol. 3 at 115-16). Father also described himself as a "patient parent" with well-behaved children. (Tr Vol. 3 at 123). Father further testified that he and Mother disagreed on educational, medical, and religious decisions concerning the children.

[30] Lastly, Father testified that, as set forth in the December 2022 interim agreement, he had paid for Mother's stay in a hotel in December 2022 and January 2023. According to the December 2022 interim agreement, Father was to be awarded a credit for that payment at a further point in time. Father tendered to the trial court, as Father's Exhibit J, an invoice from Homewood Suites revealing that he had paid $3,256.26 for Mother's hotel stay. (Ex. Vol. 2 at 131). Father requested that the trial court award him a credit for that payment. Father also asked the trial court to equally divide the marital property.

[31] GAL Rossman also testified at the hearing. She recommended that Mother be awarded primary physical custody of the children. However, GAL Rossman did not support Mother's relocation to Berlin because she was concerned that maternal grandparents would become de facto parents. Rather, GAL Rossman believed that the children should live in Milwaukee. GAL Rossman further

recommended that Parents share joint legal custody of the children with Father having final decision-making authority.

[32] In April 2024, the trial court issued a detailed twenty-one page order dissolving Parents' marriage. The trial court's order noted that Parents were both planning to relocate to Wisconsin. After considering the relevant custodial statutory factors, including the best interests of the children, the trial court noted that the children had been negatively impacted by Father's inappropriate parenting style and his tendency to yell and scare them. The trial court awarded primary physical custody of the children to Mother and authorized Mother to relocate the children to Berlin. The trial court further found that it was not feasible or in the best interests of the children for Parents to be awarded joint legal custody. Accordingly, the trial court awarded Mother "sole legal custody with the order that she shall discuss all major issues concerning the children [with Father], however, if an impasse is reached, she shall make the final decision." (App. Vol. 2 at 95).

[33] In addition, the trial court considered the relevant statutory factors regarding the division of marital property and determined that Mother had "rebutted the presumption of an equal division of the parties' marital estate." (App. Vol. 2 at 102). Specifically, the trial court addressed each of the statutory factors and found that most of them were neutral. However, the trial court found that the factor regarding the earning ability of the parties "significantly favor[ed] [Mother]." (App. Vol. 2 at 102). The trial court specifically found that "[Father]'s earnings ability is far superior to [Mother]'s. Although [Mother] has

a degree and the prospect of employment in her field, [Father]'s earnings capacity is nearly four times that of [Mother]." (App. Vol. 2 at 102). Accordingly, the trial court awarded Mother 60% of the marital estate and Father 40% of the marital estate.

[34]     Lastly, in its order, the trial court stated that it did "not include '[Mother]'s hotel expense' as a marital asset and addresses same further herein." (App. Vol. 2 at 100). However, a review of the trial court's order reveals that the trial court did not further address Father's request to be given a credit for that expense as set forth in the December 2022 interim agreement.

[35]     Father now appeals.

## Decision

[36]     At the outset, we note that there is a well-established preference in Indiana for granting latitude and deference to the trial court in family law matters. *Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016). Appellate courts "are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence." *Id.* (cleaned up). "Appellate deference to the determinations of our trial court judges, especially in domestic relations matters, is warranted because of their unique, direct interactions with the parties face-to-face, often over an extended period of time." *Hahn-Weisz v. Johnson*, 189 N.E.3d 1136, 1141 (Ind. Ct. App. 2022). "Thus enabled to assess

credibility and character through both factual testimony and intuitive discernment, our trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the involved children." *Id.*

"On appeal it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal." *Steele-Giri*, 51 N.E.3d at 124 (cleaned up). "Appellate judges are not to reweigh the evidence nor reassess witness credibility, and the evidence should be viewed most favorably to the judgment." *Id.* (cleaned up). We now turn to the issues in this case.

Father argues that: (1) the trial court abused its discretion when it awarded Mother primary physical custody and sole legal custody of the parties' four children; (2) the trial court abused its discretion when it divided the marital estate; and (3) the trial court failed to award Father a credit, as set forth in the December 2022 interim agreement, for the hotel expenses that he had prepaid for Mother. We address each of his contentions in turn.

## 1. Child Custody

Father argues that the trial court abused its discretion when it awarded primary physical custody and sole legal custody of the children to Mother. We review child custody determinations for an abuse of discretion. *Rasheed v. Rasheed*, 142 N.E.3d 1017, 1021 (Ind. Ct. App. 2020), *trans. denied.*

### A. Primary Physical Custody

[40] Father first contends that the trial court abused its discretion when it awarded primary physical custody of the children to Mother in Berlin.[1]  He specifically contends that "the evidence supports an award to Father of primary physical custody of the children . . . in the Milwaukee area[.]"  (Father's Br. 19).

[41] In an initial custody determination, both parents are presumed equally entitled to custody, and the trial court shall "enter a custody order in accordance with the best interests of the child."  I.C. § 31-17-2-8.  In determining the best interests of the child, the court shall consider all relevant factors, including the following:

> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
> > (A) the child's parent or parents;
> >
> > (B) the child's sibling; and
> >
> > (C) any other person who may significantly affect the child's best interests.

---

[1] Father does not make a separate argument that the trial court erred in authorizing Mother to relocate the children to Berlin.

(5) The child's adjustment to the child's:

    (A) home;

    (B) school; and

    (C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian. . . .

I.C. § 31-17-2-8.

[42]    Here, our review of the evidence reveals that, at the time of the dissolution hearing, Parents' daughter, M.S., was eight years old, their son, G.S., was six years old, and their twin sons, W.S. and M.B.S, were five years old. Mother wanted to relocate the children to maternal grandparents' farm in Berlin, and Father wanted them to live in the Milwaukee area so that he could live near an airport. Mother had always been the children's primary caregiver, and the children, who had spent a large portion of their lives in Berlin, considered their maternal grandparents to be members of their immediate family. The children, three of whom failed to include Father in their family drawings, told Dr. Seiss that Father yelled and that it was scary. Further, Mother is able to provide the children with stability in Berlin. On the other hand, Father's work obligations require him to spend fifteen to twenty percent of his time in Atlanta and travel internationally. In addition, based upon her concern about the dynamics

between Parents, Dr. Seiss recommended that the trial court award Mother primary physical custody of the children and authorize Mother to relocate the children to Berlin. The totality of this evidence supports the trial court's award of primary physical custody of the children to Mother. Father's arguments regarding the statutory factors are simply invitations to reweigh the evidence, which we cannot do. *See Steele-Giri*, 51 N.E.3d at 124. The trial court did not abuse its discretion when it awarded Mother primary physical custody of the children.

### B. Sole Legal Custody

[43] Father further argues that the trial court abused its discretion when it awarded Mother sole legal custody of the children. Father specifically contends that the trial court should have awarded Parents joint legal custody of the children.

[44] In determining whether an award of joint legal custody is in the best interest of the children, "the court shall consider it a matter of primary, but not determinative, importance that the persons awarded joint custody have agreed to an award of joint legal custody." I.C. § 31-17-2-15. The court shall also consider:

> (1) the fitness and suitability of each of the persons awarded joint custody;
>
> (2) whether the persons awarded joint custody are willing and able to communicate and cooperate in advancing the child's welfare;

(3) the wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;

(4) whether the child has established a close and beneficial relationship with both of the persons awarded joint custody;

(5) whether the persons awarded joint custody:

> (A) live in close proximity to each other; and
>
> (B) plan to continue to do so; and

(6) the nature of the physical and emotional environment in the home of each of the persons awarded joint custody.

I.C. § 31-17-2-15.

[45] In determining whether joint legal custody is appropriate, the trial court examines whether the parents have the ability to work together for the best interests of their children. *Carmichael v. Siegel,* 754 N.E.2d 619, 635 (Ind. Ct. App. 2001). If the parties have made child-rearing a battleground, then joint legal custody is not appropriate. *Id.*

[46] Here, our review of the record reveals that Parents have an historically contentious relationship, which led Mother to spend a large portion of the children's lives at maternal grandparents' farm in Berlin, and culminated in a physical altercation shortly before Mother filed the petition to dissolve Parents' marriage. Further, this contentious relationship continued during the pendency of the dissolution proceedings when Father berated and cursed at Mother during M.S.'s science fair. Mother has always been the children's primary caregiver, and Father's inappropriate parenting style has negatively impacted

them. Parents both acknowledged that they disagree on educational, medical, and religious decisions regarding the children. In addition, Dr. Seiss recommended that Mother have final decision-making authority regarding the children. This evidence supports the trial court's award of sole legal custody of the children to Mother. Father's reliance on GAL Rossman's recommendation that Father have final decision-making authority regarding the children is a request that we reweigh the evidence, which we cannot do. *See Steele-Giri*, 51 N.E.3d at 124. The trial court did not abuse its discretion when it awarded sole legal custody of the children to Mother.

## 2. Division of the Marital Estate

[47] Father also argues that the trial court abused its discretion when it divided the marital estate. Father specifically contends that the trial court abused its discretion when it awarded Mother 60% of the marital estate and Father 40% of the marital estate. According to Father, the trial court should have equally divided the marital estate.

[48] The division of marital assets is within the trial court's discretion, and we will reverse a trial court's decision only for an abuse of that discretion. *Smith v. Smith*, 136 N.E.3d 275, 281 (Ind. Ct. App. 2019). On review, we will not reweigh the evidence or assess the credibility of witnesses. *Id.* Further, we will consider only the evidence most favorable to the trial court's disposition of the marital property. *Id.*

[49] Pursuant to INDIANA CODE § 31-15-7-4(b), the trial court "shall divide the property in a just and reasonable manner[.]" Further, it is presumed that an equal division of the marital property between the parties is just and reasonable. I.C. § 31-15-7-5. However, this presumption may be rebutted by a party who presents relevant evidence, including evidence concerning the following factors, that an equal division would not be just and reasonable:

> (1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.
>
> (2) The extent to which the property was acquired by each spouse:
>
> > (A) before the marriage; or
> >
> > (B) through inheritance or gift.
>
> (3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court considers just to the spouse having custody of any children.
>
> (4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.
>
> (5) The earnings or earning ability of the parties as related to:
>
> > (A) a final division of property; and
> >
> > (B) a final determination of the property rights of the parties.

I.C. § 31-15-7-5.

[50] The trial court must state its reasons for deviating from the presumption of an equal division in its findings and judgment. *Eads v. Eads,* 114 N.E.3d 868, 874 (Ind. Ct. App. 2018). Also, the party challenging the trial court's property division bears the burden of proof. *Smith v. Smith,* 194 N.E.3d 63, 72 (Ind. Ct. App. 2022). That party must overcome a strong presumption that the trial court complied with the statute and considered the evidence on each of the statutory factors. *Id.* The presumption that a dissolution court correctly followed the law and made all the proper considerations when dividing the property is one of the strongest presumptions applicable to our consideration on appeal. *Id.* (cleaned up).

[51] Here, our review of the record reveals that the trial court properly considered the statutory factors. Specifically, the trial court found that the first four statutory factors were neutral. However, regarding the fifth factor, the trial court found that Father's earning ability at the time of the dissolution, which was four times that of Mother's earning ability, justified a deviation from the presumption of an equal division. Indeed, our review of Parents' testimony reveals that Father earns nearly $200,000 per year. On the other hand, Mother, who has not worked for the past six years because she has stayed at home with and taken care of her four children, testified that she thought she would make about $50,000 per year if she went back to work. Father has failed to meet his burden to overcome the strong presumption that the trial court complied with the statute, considered the evidence on each of the statutory factors, and

correctly followed the law. Accordingly, the trial court did not abuse its discretion when it divided the marital estate.

### 3. Prepaid Hotel Expenses

[52] Lastly, Father argues that the trial court failed to award Father a credit, as set forth in the December 2022 interim agreement, for the hotel expenses that he had prepaid for Mother. We agree.

[53] We interpret settlement agreements under a de novo standard. *Scott v. Corcoran*, 135 N.E.3d 931, 939 (Ind. Ct. App. 2019). The rules governing contracts are applicable when we interpret the terms of the agreement. *Id*. If the terms are clear and unambiguous, the terms "are deemed conclusive." *Id*. (cleaned up).

[54] Here, the December 2022 interim agreement provided that Father would prepay Mother's hotel costs and that those costs "shall be credited against any child support arrearage and/or property equalization payout owed at the finalization of this cause." (App. Vol. 2 at 58). These terms are clear and unambiguous.

[55] At the dissolution hearing, Father tendered, and the trial court admitted into evidence, an invoice for Mother's stay at Homewood Suites. The invoice reveals that Father paid $3,256.26 for Mother's stay. Father asked the trial court to award him the credit for his payment as set forth in the December 2022 interim agreement. In the dissolution order, the trial court stated that it did "not include '[Mother]'s hotel expense' as a marital asset and addresses same

further herein." (App. Vol. 2 at 100). However, our review of the trial court's order reveals that the trial court did not further address Father's request for that credit and that Father did not receive that credit. Therefore, we remand this case to the trial court with instructions for the trial court to award Father the $3,256.26 credit for the expenses that he had prepaid for Mother's hotel stay.

[56] Affirmed in part and remanded with instructions.

Weissmann, J., and Felix, J., concur.

ATTORNEYS FOR APPELLANT

Bryan L. Ciyou
Ciyou & Associates, P.C.
Indianapolis, Indiana

Anne M. Lowe
Fugate, Gangstad, Lowe, LLC
Carmel, Indiana

ATTORNEY FOR APPELLEE

Jon J. Olinger
The Law Office of Jon J. Olinger, LLC
Fort Wayne, Indiana